PHILIP O'BRIEN, JR., guardian ad litem, vs.
WILLIAM DWIGHT & others.[1]

Hampden. February 8, 1972. — March 12, 1973.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, HENNESSEY,
KAPLAN, & WILKINS, JJ.

*Fiduciary. Fraud. Executor and Administrator,* Duty of fidelity,
Accounts. *Trust,* Trustee's accounts, Assets of trust, Negligence
of trustee. *Negligence,* Trustee. *Equity Jurisdiction,* Breach of
fiduciary duty. *Interest. Probate Court,* Report; Master-Auditor:
appointment, conclusions, rulings of law; Accounts; Revocation of
decree. *Equity Pleading and Practice,* Master: appointment. *Practice, Civil,* Auditor: appointment. *Words,* "Fraud."

Where a judge of a Probate Court reported a question whether the
appointment of a guardian ad litem in connection with a trus-
tee's first account, by an order in the usual form, authorized such
guardian to inquire into prior accounts of other fiduciaries and to
bring a petition in equity and a petition to revoke the decrees
allowing those accounts, and where the only brief specifically argu-
ing such question was the brief filed by the guardian, who argued
in support of his action, this court was not required to decide the
question. [275–276]

Where a judge of a Probate Court upheld the authority of a guardian
ad litem on every occasion it was questioned, there was an implied
ratification of the guardian's actions to the extent they were not
authorized by his original appointment. [276]

Where, subsequent to a demurrer by the respondents to a petition
in equity in a Probate Court by a guardian ad litem to compel the
respondents to turn over to a trustee certain property and to
account for and pay to the trustee income and profits, the guardian
filed a petition to revoke decrees allowing accounts of an execu-
trix and an administrator, the guardian did not have to rely
on his petition in equity as a collateral attack on the accounts, but
could still rely on the petition in equity as a vehicle for requiring
the respondents to restore the assets to the trust if the accounts
were reopened and the respondents found liable. [276–277]

This court declined to answer questions reported by a judge of a
Probate Court as to the legal sufficiency of pleadings filed ten
years before in certain proceedings; the real question was the
correct result of the proceedings on the basis of facts found in the
interval. [277–279]

---

[1] The respondents in addition to William Dwight are his sisters,
Laura Dwight Lewis and Helen Dwight Schoeffler, his children, Wil-
liam Dwight, Jr., Donald R. Dwight and Mary Emily Dwight Wilson,
and the testamentary trustee, the Holyoke National Bank.

O'Brien v. Dwight.

Although a decision to refer cases to masters or auditors is an exercise of judicial discretion, the corresponding responsibility and consequences of a reference are such that the discretion should be exercised most discriminately and reasonably sparingly.  [279–280]

Where the report of a master-auditor in a Probate Court proceeding showed on its face all the subsidiary facts upon which he based his general findings, this court was not bound by his general findings and must take the subsidiary findings together with inferences that ought to be drawn from them and reach its own conclusions.  [281]

If a master-auditor in a Probate Court proceeding makes incorrect rulings of law or rulings of law he is not authorized to make, they do not bind this court in any way and will be disregarded. [282]

Discussion of the general principles governing the conduct of fiduciaries dealing with trust property.  [283–284]

Where it appeared that a woman as executrix of a will and life tenant of the decedent's estate held nearly all the stock of a prosperous newspaper corporation and that she and her son, who were a majority of the directors of the corporation, caused its plant and business to be transferred, without consideration other than a rental, to a newly formed corporation in which they owned all but one of the shares of stock as individuals, they thereby violated their fiduciary duty to a remainderman of some of the stock in the older corporation.  [284]

Discussion and review of authorities pertaining to the finality of decrees of a Probate Court allowing accounts and the authority of the Probate Court to vacate a decree procured by fraud.  [285–289]

On a petition to revoke decrees of a Probate Court allowing accounts of the executrix of a will and an administrator with the will annexed of the estate not already administered, where it appeared that the executrix, as such and as life tenant of the estate, held nearly all the stock of a prosperous newspaper corporation, that her son, later such administrator, was a director of the corporation, that he and she were a majority of the directors, and that they caused a transfer of the plant and business of the corporation to a corporation in which they as individuals owned all but one of the shares, that such transfer was made without consideration other than a rental, and that such self-dealing was not disclosed in the allowed accounts, it was held that the decrees were procured by fraud in law under G. L. c. 206, § 24.  [284–289]

Where certain fiduciaries violated their duty to a remainderman of some of the stock of a prosperous newspaper corporation by causing a transfer of its plant and business to a newly formed corporation in which they as individuals owned virtually all the stock, the remainderman was entitled to a share of the ownership of the new corporation proportionate to the number of his shares in the older corporation [289–290]; but the remainderman was not entitled to a share of the ownership of certain other corporations not shown to have been recipients of any property or assets wrongfully diverted from the older corporation or of any business opportunity which should have been for the benefit of the older corporation [290].

In the circumstances, on a petition by a guardian ad litem in a Pro-

bate Court asserting a claim for the benefit of a testamentary trust, orders should be made for payment of interest on loans made by corporations in which the trust had an interest. [291–292]

A testamentary trustee having a remainder interest in stock of a corporation and thereby, in the circumstances, also a proportionate share in the ownership of a second corporation distributable upon the death of the life tenant of the stock in the first corporation was entitled to dividends declared after the death of such life tenant with respect to such proportionate share in the ownership of the second corporation, and interest upon such dividends from their payment by the second corporation to the date of their receipt by the trustee. [293]

Discussion of the standard of care owed by a trustee in managing a trust. [294–295]

On the record, a trustee under a will having a remainder interest in part of the stock of a corporation and also, as appeared many years later, a proportionate part of the ownership of a second corporation by reason of diversion of assets of the first corporation to the second corporation by persons who were the personal representatives of the testator's estate was not negligent in assenting to accounts of the personal representatives and in assuming finality of decrees allowing them, or by not making an investigation which would have disclosed such diversion of assets, or in accepting distribution of the shares in the first corporation without demanding shares in the second corporation, or in relying on the value of the distributed shares in the first corporation fixed by three appraisers appointed by the Probate Court but not reflecting the interest in the second corporation, or in selling the distributed shares at the appraised value. [295–296]

PETITION filed in the Probate Court for the county of Hampden on October 1, 1958, for allowance of the first account of the trustee under the will of William G. Dwight.

PETITION IN EQUITY filed in that court on June 29, 1961.

PETITION for revocation of decrees filed in that court on November 16, 1961.

The proceedings were reported by *Smith, J.*

*Philip O'Brien, Jr.* (*Thomas D. O'Brien* with him) for the petitioner.

*Louis F. Oldershaw* for the Holyoke National Bank, trustee.

*Joseph L. Cotter* (*Preston H. Saunders* with him) for William G. Dwight & others.

QUIRICO, J.  This matter is before us on a reservation and report of twenty questions of law by a judge of the

Probate Court purporting to act under G. L. c. 215, § 13.[2]  The questions, all interlocutory in nature, result from action taken by a guardian ad litem (guardian), appointed by the court to represent the interest of two named minors and of persons unborn or unascertained who are or may become interested as remaindermen of a testamentary trust after the death of the life beneficiary,[3] in connection with the allowance of the first account of the trustee.  The guardian (a) objected to the allowance of the account, (b) filed a petition to revoke decrees allowing the accounts of the executrix under the will setting up the trust and the account of the administrator with the will annexed of the estate not already administered (administrator) under the same will (petition to revoke decrees), and (c) filed a petition in equity seeking to compel the individual respondents to turn over to the testamentary trustee certain property held by them which allegedly belongs to the trust and to account for and pay to the trustee their income and profits from said trust property.

The judge referred all three matters to a single lawyer (master-auditor) to hear the parties, receive their evidence, find the facts and report his findings to the court. The trustee's account was referred to him as an auditor whose findings of fact were to be final, and the other two petitions were referred to him as a master.  The master-auditor filed a combined report on all three matters. Underlying all of the interlocutory questions reported by the judge to this court is the controlling question whether

---

[2] This section provides: "A judge of the probate court by whom a case or matter is heard for final determination may reserve and report the evidence and all questions of law therein for consideration of the full court, and thereupon like proceedings shall be had as upon appeal. And if, upon making an interlocutory decree or order, he is of opinion that it so affects the merits of the controversy that the matter ought, before further proceedings, to be determined by the full court, he may report the question for that purpose, and stay all further proceedings except such as are necessary to preserve the rights of the parties."

[3] The life beneficiary is Henry Dwight, a son of the testator, and the named minors whose interests are represented by the guardian are Laurie Ann Dwight and David Dwight who are grandchildren of Henry Dwight and great-grandchildren of the testator.

the facts found and reported by the master-auditor entitle the guardian to the relief which he seeks against the respondents. Our statement of the facts, or summary thereof sufficient for the purposes of this opinion, is based principally on the report of facts found by the master-auditor but also in part on (a) copies of records of the Probate Court which are reproduced in the judge's report, and (b) the guardian's allegations of apparently undisputed facts in his petition in equity and petition to revoke decrees which are admitted by the respondents in their answers. For reasons stated in the margin[4] the facts now before us are limited to those bearing on the guardian's right to relief or recovery, and we have no facts bearing on the nature or amount of such relief or recovery, if the guardian is entitled to prevail.

At his death on March 31, 1930, William G. Dwight (testator) was survived by the following heirs: his widow Minnie R. Dwight who was his second wife, his son Henry Dwight, the child by his first wife who died shortly after Henry's birth, his son William Dwight, and his daughters Helen Dwight Schoeffler and Laura Dwight

---

[4] On June 6, 1961, the judge referred the matter of the first account of the Holyoke National Bank, trustee for the benefit of Henry Dwight and others, to the auditor for hearings "to begin November 27, 1961 and . . . end not later than December 29, 1961." On November 30, 1961, the judge referred the guardian's petition in equity and his petition to revoke decrees to the same person as master for hearings "to begin December 4, 1961," and ordered all three matters consolidated for hearing. On June 7, 1963, the judge, stating that the hearings before the master-auditor had "become protracted," amended the three orders of reference by an order bifurcating the hearings. The new order required the master-auditor first to receive evidence "upon all issues except valuation or the valuing and assessing of money damages," and to settle his report on the issues thus heard. The order required him thereafter "to continue the hearings and to receive any additional evidence which the parties may desire to offer upon any issue of valuation or matters pertaining to the valuing and assessing of monetary damages which may have been sustained by any of the parties represented by the Guardian ad Litem." On September 18, 1967, the judge, again stating that the hearings before the master-auditor had "become protracted," further amended the three orders of reference by striking out the authority of the master-auditor to proceed with the second half, or damage phase, of the bifurcated hearings, and requiring him to file his report on the first half, or liability phase "as though the report so prepared and filed were to be his only and final report in the case." A report as thus limited was filed by the master-auditor on November 15, 1967, and no further report has been filed by him.

Lewis, the last three being children of the testator and his second wife and widow, Minnie.

For many years prior to his death on March 31, 1930, the testator had been associated with the publication of a newspaper first called the "Holyoke Transcript" which in 1926 was changed to the "Holyoke Daily Transcript-Telegram." Since nothing in this opinion turns on the precise name used, the newspaper will be referred to as the "Transcript." Formerly the testator was the sole proprietor of this newspaper business but about January 12, 1921, he transferred it to Holyoke Transcript, Inc., a Massachusetts corporation. The corporation was authorized to issue 800 shares of stock. It issued 798 shares to the testator, one share to his wife, Minnie R. Dwight (Mrs. Dwight), and one share to their daughter Helen (now Helen Dwight Schoeffler, a respondent). The testator never acquired the latter two shares. When he died his estate included the 798 shares and certain other assets, but the present litigation does not involve those other assets.

The will of the testator was drawn on June 28, 1926, naming Mrs. Dwight as executrix. It was allowed on April 23, 1930, and Mrs. Dwight was appointed executrix. She served in that capacity until her death on July 31, 1957. The will first gave all of the testator's property to Mrs. Dwight "for and during the term of her natural life, she to have full control and management of the same and receive the income from the same during the term of her natural life," and it gave her the power to sell assets without obtaining permission from the Probate Court. The will provided for the following distribution of the shares of stock of Holyoke Transcript, Inc., after the death of Mrs. Dwight: 401 shares to the testator's son William Dwight, 133 shares to the testator's daughter Laura Dwight Lewis, 133 shares to the testator's daughter Helen Dwight Schoeffler, and 133 shares to the Holyoke National Bank, "as trustee and in trust for my son, Henry Dwight . . . he to have the use and income of the same during his life

and . . . [a]fter the death of said Henry Dwight, any residue in the hands of said trustee from said trust fund herein referred to I direct shall be paid to said Henry Dwight's heirs or legal representatives." [5]

Although the will purported to dispose of 800 shares of stock in Holyoke Transcript, Inc., we have noted above that the testator held only 798 such shares, the corporation having issued one to Mrs. Dwight and one to their daughter Helen. Shortly after the testator's death Mrs. Dwight transferred her one share to her son William, and on advice of counsel she sold five more shares to him from the 798 held in the estate of which she was executrix. The sale was made at the appraised value of $333.53 a share. This left only 793 such shares for distribution when the life estate terminated at the death of Mrs. Dwight on July 31, 1957. The actual distribution made, instead of that provided in the will, was as follows: 397 shares to William, 132 shares each to Laura and Helen, and 132 shares to the Holyoke National Bank as trustee for Henry for life and then to his heirs or legal representatives. Since William and Helen previously held shares of the same corporation, this distribution increased their holdings to 403 shares for William and 133 for Helen.

After the death of the testator on March 31, 1930, his son William was made managing editor of the Transcript and he commenced to participate in managerial

[5] The will contained the following restrictions on transfer and other statements concerning the shares of stock of Holyoke Transcript, Inc.: "[T]he stock in the Holyoke Transcript, Inc. . . . shall not be sold by any of the beneficiaries herein named without first offering the same for sale to the other beneficiaries. I make this provision, because it is my wish and desire to keep . . . [this stock] in the Dwight family, as long as any member or members of my family wish to continue the same . . . . It is my intention that those of my family herein named shall retain the ownership and control of the Holyoke Daily Transcript so long as the same may seem practicable to my said executrix, trustee and heirs. If at any time any of my beneficiaries shall decide to sell their stock in the Holyoke Transcript, Inc., they shall sell their stock, at a reasonable price, to those of my heirs who wish to buy the same. It is my purpose that the controlling interest of the Holyoke Transcript, Inc. . . . shall be held and owned by members of my family who wish to continue the paper and that the Holyoke Daily Transcript may, by unity of interest and aims, continue to be a responsible newspaper."

decisions. However, Mrs. Dwight, the testator's widow and executrix, who was an experienced newspaperwoman, and her brother, Arthur Ryan, who had been employed by the Transcript since 1908, were the principal officers and managers of the newspaper business. William's influence increased with the years.

On January 15, 1934, Mrs. Dwight, Arthur Ryan and William Dwight formed a Massachusetts business corporation under the name of Holyoke Transcript-Telegram Publishing Co., Inc. (Publishing Company). They caused the corporation to issue 198 shares of its stock to Mrs. Dwight individually and not in her capacity as executrix or life tenant, and one share to each of the other two incorporators. The corporate purposes of the new Publishing Company were almost identical to those of the Holyoke Transcript, Inc. In so far as the stated purposes were concerned, there was nothing which the new corporation could do which the prior corporation could not also do. Thus, both corporations were authorized to publish a newspaper. Mrs. Dwight in her capacity as executrix held the controlling shares in the Holyoke Transcript, Inc., and in her individual capacity held the controlling shares in the Publishing Company. She was president of both corporations, and she, her brother, Arthur Ryan, and her son William were the principal officers of both corporations.

While the corporate situation was as described above, the Holyoke Transcript, Inc., leased its entire physical plant, including its real estate, presses and other personal property, to the Publishing Company for a term of five years beginning March 1, 1934, at an annual rental of $75,000. That rental payment also covered a license given to the Publishing Company to publish the newspaper under the name of "Holyoke Daily Transcript and Telegram," and the right of the lessee to use that name as part of its corporate name.[6] As a result of

---

[6] The board of directors of Holyoke Transcript, Inc., consisting of Mrs. Dwight and her son William had voted on January 12, 1934, as follows: "VOTED: that the assistant treasurer and the clerk of

this transaction Holyoke Transcript, Inc., was reduced to a real estate holding and property leasing corporation and the Publishing Company took over the entire business of publishing the newspaper. That business relationship of the two corporations was continuing on the date of the master-auditor's hearings. The three officers common to the two corporations caused the ownership of the plant and the business of publishing the newspaper to be placed in separate corporations on advice of counsel because they were "concerned that the newspaper's publication might be stopped some day by attachments of the plant if someone sued the corporation for defamation or some other harassing purpose."

The annual rental of $75,000 was originally fixed by the three persons who were the principal officers of both corporations. The annual rents actually paid by the Publishing Company for the years from the beginning of the lease were the following:

| 1934 | $ 75,000 (prorated for part of the year) |
|------|------|
| 1935 | 75,000 |
| 1936 | 75,000 |
| 1937 | 70,000 |
| 1938 | 40,000 |
| 1939 through 1941 | 50,000 annually |

the corporation be and they hereby are, authorized, in their discretion, to lease the real estate, presses and other property of the Holyoke Transcript, Inc., real and personal, in whole or in part, to a new corporation to be formed and known as the Holyoke Transcript-Telegram Publishing Co., Inc., for such consideration, for such period of time and on such terms as they deem best, and that the assistant treasurer be, and he hereby is, authorized and instructed to execute in the name and behalf of the corporation said lease and any and all other papers and documents, and to do all things necessary or advisable to be done to execute and put into effect said lease and to put said corporation in possession of the demised premises, machinery, etc., and voted further that said new corporation be accorded the privilege of using the name of 'Holyoke Transcript-Telegram Publishing Co., Inc.' and of using the name of the newspaper now published in Holyoke, Massachusetts, by Holyoke Transcript, Inc., until notice shall be given said new corporation not to use the name of such newspaper, said new corporation to agree to publish said newspaper in substantially its present form or style or makeup during the duration of said lease."

| 1942 through 1945 | 60,000 annually |
| 1946 | 75,000 |
| 1947 | 80,000 |
| 1948 and 1949 | 96,000 annually |
| 1950 | 108,000 [7] |
| 1951 through 1954 | 120,000 annually |
| 1955 | 126,000 |
| 1956 and 1957 | 132,000 annually. |

The decisions to pay the reduced rent in the years 1937 through 1945 were made by Mrs. Dwight. Holyoke Transcript, Inc., had the right to terminate the lease for nonpayment of the agreed rent, but it did not exercise that right. The amount of rent which Mrs. Dwight agreed or permitted the Publishing Company to pay to Holyoke Transcript, Inc., was determined more by the financial needs, and ultimately the financial success, of the Publishing Company than by any consideration of the rental value of land, buildings and equipment rented, and the rent charged and paid was directly related to the right to publish the newspaper and was not rent in the ordinarily accepted sense.

Under the testator's will the trust was to receive 133 (actually reduced to 132 as noted above) of the 800 shares of stock of Holyoke Transcript, Inc., which, at the testator's death, was in the business of publishing the newspaper. When the life estate of Mrs. Dwight terminated and distribution of the 132 shares was made to the trust, Holyoke Transcript, Inc., was no longer in the business of publishing the newspaper, and the trust received no part of the shares of stock of the Publishing Company to which that business had been diverted by the three persons controlling both companies. Two of such persons, Mrs. Dwight and William Dwight, were at all times beneficiaries under the testator's will, and each was at some time the executrix or administrator thereunder.

Regardless of the motive which prompted Mrs. Dwight,

---

[7] In 1950 Holyoke Transcript, Inc., purchased and installed a new press at a complete cost to it of about $398,000.

her son William and her brother Arthur Ryan to divest Holyoke Transcript, Inc., of its newspaper publishing business and to transfer it to their new corporation, the Publishing Company, it is clear that the effect of this transfer on the trust for the benefit of Henry Dwight and his heirs was to deprive the trust of the benefits which might result from its beneficial ownership of about a one-sixth interest in that business.

When the Publishing Company was incorporated in 1934, Mrs. Dwight became the owner of 198 of the 200 shares originally issued. The total number of such shares owned by her increased over the years, in large part due to stock dividends declared on capitalization of earned surplus. Starting in 1946 Mrs. Dwight made annual gifts of these shares to her son William and to her daughters Helen and Laura, thus diluting her ninety-nine per cent ownership of the corporation's shares in 1934 to about fifty-four per cent by the end of 1956. Despite these gifts, she still owned 32,388 shares of the Publishing Company at the time of her death on July 31, 1957. These shares were appraised at a total of $195,623.50 in the inventory of her estate, and they were all bequeathed to her son William, and to her daughters Helen and Laura. William was the executor of the will.

There is no indication that Mrs. Dwight ever gave or bequeathed any of these shares to Henry Dwight or to any trustee for his benefit. Although the master-auditor reported no finding of the number of such shares now held by any of the respondents, his report included the following statement in a footnote: "During the hearings the Guardian ad Litem developed undisputed evidence of intra-family gifts of stock in the Publishing Company . . . made by Mrs. Dwight and by William Dwight. Subsequently all the donees of these gifts were made parties respondent to these proceedings. Since the donees and the amounts of stock comprising each gift are not contradicted I make no further findings concerning either here."

The guardian, by the several proceedings instituted and prosecuted by him, seeks in part an order that the respondents: (a) turn over and transfer to the trust its proportionate part of the shares of stock held by them in the Publishing Company, Valley-Photo-Engraving Corporation (Valley-Photo) and the Hampden-Hampshire Corporation (Hampden-Hampshire), and (b) that they account for and pay over to the trust "the profits and unjust enrichment realized by [them] . . . and the damages caused the testamentary trust . . . by them respectively." Although we are not at this point in the proceedings concerned with the amount of damages for which any respondent may be liable, it is appropriate to note that it is obvious from the findings of the master-auditor that the well established newspaper publishing business which Mrs. Dwight, her son William, and her brother, Arthur Ryan, caused Holyoke Transcript, Inc., to transfer to the Publishing Company, which they also owned and controlled, was a valuable asset and a profitable business venture. The master expressly found that "the transfer represented a loss in 1934 to Holyoke Transcript, Inc. in an amount which I cannot calculate and report until evidence of valuation is presented," and that the transfer "substantially diminished the then value" of the stock of Holyoke Transcript, Inc.

The Publishing Company started in 1934 with a total paid in capital of $1,000 received for the 200 shares which it then issued for $5 each. No additional capital was paid in thereafter. The profitability of its newspaper business is indicated by the following. By capitalizing earned surplus it declared three stock dividends, $24,000 in 1941, $125,000 in 1954 and $150,000 in 1956, for a total of $299,000. It paid cash dividends of $30,000 a year from 1947 through 1955, and $36,000 a year for 1956 and 1957, for a total of $342,000. At the end of 1957 it still had a balance of $105,029 in its earned surplus account.

Mrs. Dwight's first account as executrix was filed on December 31, 1956, for the period from the date of her

appointment on April 24, 1930, and ending with November 30, 1956.[8]    Schedule A of the account started with an entry of $334,863.13 which was the amount of personal property according to the inventory of the estate as filed in 1930.   That inventory figure included the item of "798 shares Holyoke Transcript, Inc. at $333.53 — $266,156.94."   Schedule A of the account also included the following item of income: "Received from sale of Holyoke Transcript, Inc. stock (5) shares — $1,666.65." That item represents the sale by the executrix to her son William which we have mentioned above.   Schedule C of the account, which "contains all items of personal property now in possession of the accountant," includes in its total of $269,758.02 the item: "793 shs. Holyoke Transcript, Inc. — $264,490.29."   Thus the executrix was accounting for these remaining shares at their "appraised value" as appearing in the estate inventory and as required by G. L. c. 206, § 5.   There was nothing in the account to indicate that in 1934 Holyoke Transcript, Inc., had transferred its newspaper publishing business to the Publishing Company, nor was there any reference to any shares of stock of the latter corporation or income therefrom.

Mrs. Dwight and all four children of the testator assented to the allowance of the first account of the executrix.   On February 19, 1957, the judge appointed a guardian ad litem (other than the present guardian) to represent the interests of various named minors and of "unborn and unascertained persons [who] may be interested" in the allowance of the account.   On the following day that guardian ad litem filed a written assent to the allowance of the account.   The judge allowed the account by a decree entered on February 26, 1957.   No appeal was claimed from that decree.   This

---

[8] This did not comply with the requirement of G. L. c. 206, § 1, that "[a]n executor, administrator, guardian or conservator, or a trustee required by law to give bond to a judge of probate, shall render an account relative to the estate in his hands at least once a year . . . until his trust is fulfilled" unless excused by the court, but that question is not before us in this case.

is the first of the three decrees which the guardian asked the Probate Court to revoke.

Mrs. Dwight died on July 31, 1957, having filed no further account as executrix. On October 11, 1957, her son William was appointed administrator to succeed her. He prepared and filed the second and final account for the deceased executrix covering the period from December 1, 1956, through October 14, 1957. Basically, it showed that the executrix started that period with the balance of $269,758.02 which she had at the end of the period covered by her first account, that she received two small items of interest and paid three items of expense, and that the balance of $269,327.39 was turned over to her successor, William Dwight, as administrator. That account was assented to by the four children of the testator and it was allowed by the judge by a decree entered on April 24, 1958, without appointment of a guardian ad litem. No appeal was claimed from that decree. This is the second of the three decrees which the guardian asks the Probate Court to revoke.

William filed his inventory as administrator on December 16, 1957. It listed personal property having a total appraised value of $269,327.39, which was the amount received from the deceased predecessor executrix. This total included the item of "793 shs. Holyoke Transcript, Inc. — $264,490.29." These shares were thus appraised at $333.53 each as they had been in the original 1930 inventory of the testator's estate.

William's first and final account as administrator was filed on February 20, 1958, for the period from his appointment on October 14, 1957, through January 31, 1958. It showed a complete distribution of all personal property of the estate of the testator. One item of distribution was "Holyoke National Bank, Trustee for Henry Dwight, distribution of stock $44,025.96." This represented the distribution of 132 shares of stock of Holyoke Transcript, Inc., accounted for at the appraised value of $333.53 a share. This account was assented to by all four children of the testator, and by the Holyoke

National Bank as testamentary trustee. It was allowed by the judge by a decree entered on April 24, 1958. No appeal was claimed from that decree. This is the third of the three decrees which the guardian asks the Probate Court to revoke.

The testamentary trustee for the benefit of Henry Dwight and others was appointed by the Probate Court on September 10, 1957, and later that month it received from William, as administrator, the 132 shares of stock of Holyoke Transcript, Inc., due it under the will. On or before October 21, 1957, these shares were appraised at $760 each, for a total of $100,320, by three appraisers appointed by the Probate Court. One appraiser was a vice-president of the trustee, one was a real estate and insurance broker, and one was a certified public accountant who had been the accountant for Holyoke Transcript, Inc., since 1921 and had also served in a similar capacity for other Dwight family firms. In determining the value of the shares the appraisers had available to them all necessary information from financial records of Holyoke Transcript, Inc., but not of the Publishing Company or of other related corporations. In its inventory filed on November 12, 1957, the trustee listed these shares at the appraised value as its sole asset.

When William delivered the certificate for the 132 shares of stock to the trustee, he told the latter's trust officer that it was the policy of the Holyoke Transcript, Inc., management to build up earned surplus against the day when a new plant would be built and equipped and, therefore, not to pay dividends. Some time before October 21, 1957, he offered to purchase the same 132 shares from the trustee at the appraised value, 100 of the shares to be purchased by Holyoke Transcript, Inc., and the other 32 shares by Valley-Photo, a corporation controlled by him. On October 22, 1957, the trustee's board of directors voted to accept the offer, and at the same meeting or prior thereto voted to make collateral loans of $65,000 and $25,000 to Holyoke Transcript, Inc., and Valley-Photo, respectively. The proceeds of these loans

were used by the borrowers to pay for the shares being sold them by the trustee which was also the lender.

The trustee filed its first account on October 1, 1958, for the year ending September 13, 1958. The account showed that the trustee had sold the 132 shares of stock of Holyoke Transcript, Inc., and replaced them with a variety of diversified securities and some bank deposits. On January 13, 1959, Philip O'Brien, Jr., Esquire, was appointed guardian ad litem in connection with this account. On November 25, 1960, he filed a lengthy written objection to the allowance of the account (*Young* v. *Tudor*, 323 Mass. 508, 509), stating therein many of the facts later alleged by him in his petition in equity and petition to revoke decrees, thus commencing the proceedings now before this court on report by the judge of the Probate Court.

Both by his petition in equity and his petition to revoke decrees, the guardian alleges that assets of the estate were wrongfully and unlawfully used, transferred or diverted from the estate by the executrix to or for the benefit of two additional corporations, Valley-Photo owned and controlled by her son William, and Hampden-Hampshire in which the executrix held at least a substantial, and perhaps a controlling, number of shares. As to these two corporations the guardian seeks the same kind of relief, for the benefit of the trust, which he seeks with reference to the Publishing Company. Briefly, he asks that the respondents be ordered to turn over to the trust its proportionate part of the shares of these corporations and to account to the trust for profits, unjust enrichment and damages. The master-auditor made detailed findings on this part of the guardian's claim, but basically he found the facts against the guardian as to each of the corporations.

Valley-Photo was formed by William on June 1, 1935, after the Publishing Company had decided to discontinue its own photo-engraving operation. This decision was made primarily by Mrs. Dwight, the executrix and life tenant, for purposes properly connected with the

business interests of the newspaper and it was in the interest of the whole estate. It was a prudent, conservative, honest decision taken with due regard for relevant business reasons. On June 24, 1935, the Publishing Company sold its photo-engraving equipment and supplies to Valley-Photo, and Holyoke Transcript, Inc., gave Valley-Photo a lease of the space theretofore occupied by the photo-engraving department of the Publishing Company. From time to time between 1935 and 1941, both corporations extended financial aid by way of loans to Valley-Photo and all of the loans were repaid. Valley-Photo did all of the photo-engraving work for the Publishing Company and it did so at rates which were lower than those charged to other customers. The aid extended to Valley-Photo by the other two corporations was justified by the advantages which the newspaper received, and in the long run the newspaper was considerably benefited and strengthened.

Hampden-Hampshire was formed by Mrs. Dwight on February 3, 1937, for the purpose of operating a commercial radio station to serve the Holyoke and Northampton area. She was joined in that enterprise by a lady from Northampton of whom the master-auditor said that she, like Mrs. Dwight, was "the matriarch of a newspaper family." The required license was obtained in October, 1940, and broadcasting began in March, 1941. The Holyoke studio was in space leased at an annual rental of $1,200 from Holyoke Transcript, Inc., and located in the same building occupied by the Publishing Company. The lessor expended $4,928.77 to construct the studio. The rent for the period from March 14, 1941, through December 31, 1942, amounting to $2,196, was never paid. In the beginning the Publishing Company, with Mrs. Dwight's approval, aided the radio station operation by making available to the latter's employees information and news items obtained over the newspaper wire services and by the newspaper reporters. This did not interfere with the duties of the newspaper employees. Later the radio station set up its own news staff and

mutually beneficial information was exchanged by the radio station and the newspaper. The two media were not competitive.

The master-auditor finds the following financial transactions relating to Hampden-Hampshire. About February 3, 1937, Mrs. Dwight paid it $30,000 for its initial issue of 600 shares of capital stock at $50 a share. On February 26, 1937, Holyoke Transcript, Inc., loaned it $10,000 which was paid back by 1943. The master-auditor made no finding whether any interest was charged or paid on this loan. Between 1937 and 1941 Mrs. Dwight loaned Hampden-Hampshire $8,400. At some time in 1937 Mrs. Dwight borrowed $30,000, without interest, from Holyoke Transcript, Inc., which the master-auditor infers and finds was used to purchase stock of Hampden-Hampshire. She repaid the corporation $20,000 of the loan in 1938 and she repaid the balance in instalments by the end of 1951, and she had owed it nothing since then. Holyoke Transcript, Inc., borrowed $20,000 from the Holyoke National Bank on February 26, 1937, and increased the borrowing to $30,000 on May 5, 1937. It repaid the bank in full on March 7, 1938. It borrowed $25,000 from the bank on April 4, 1939, and repaid the bank in full on April 4, 1940. Although the master-auditor recites these borrowings by Holyoke Transcript, Inc., he adds that the records and evidence did not disclose why the money was borrowed or the dollar amount of interest paid on the loans. He recites no inference, if any, drawn by him from these three loans by the bank.

The only other significant finding of the master-auditor on the radio station business of Hampden-Hampshire was that "it was never at any time an enterprise related to the publishing, ownership or control of 'Holyoke Daily Transcript' or Holyoke-Transcript, Inc. as the pre-1934 publisher of Holyoke Daily Transcript-Telegram. . . . [I]t may have developed more newspaper buyers but this was an indirect benefit, at best. It was a separate activity in the news media

field, and engaged primarily in entertainment."

In both his petition in equity and his petition to revoke decrees the guardian alleges that the testamentary trustee was guilty of negligence in the discharge of its duties, particularly in its alleged failure to take action necessary to gather into the trust all the assets to which the trust is entitled. The master-auditor made extensive findings on this subject and concluded that the trustee was negligent. The recital and discussion of these is deferred to a later part of this opinion.

Having summarized the pertinent facts appearing in the record, except as to the alleged negligence of the trustee, we turn now to the consideration of the questions reported by the judge for our decision. Before considering the twenty questions, either individually or in groups by subject matter, it is appropriate to comment briefly on the source and scope of the authority of the judge to make such a report. The sole source of the power of a probate judge to "reserve and report" a case or question to "the full court" is G. L. c. 215, § 13. The power thereby conferred is limited to two classes of cases: (a) cases which have been "heard for final determination," in which cases the judge may "reserve and report the evidence and all questions of law therein for consideration of the full court, and thereupon like proceedings shall be had as upon appeal," and (b) cases in which an interlocutory decree or order has been made which, in the opinion of the judge, "so affects the merits of the controversy that the matter ought, before further proceedings, to be determined by the full court." In the latter case the judge may report questions to "the full court." *Dunlop* v. *Claussen*, 313 Mass. 715, 716. Since the present case has not been "heard for final determination" it comes within the second class of cases which may be reported.

By a series of orders and interlocutory decrees the judge (a) denied the pleas in bar of all respondents to the guardian's petition in equity and his petition for revocation of decrees allowing prior accounts, (b) over-

ruled the demurrers of all respondents to the same petitions, (c) overruled the objections of the guardian and of all respondents to the master-auditor's report, (d) denied the motions of all respondents to recommit the master-auditor's report, and (e) confirmed the report of the master-auditor. Shortly after entering the last of these orders and decrees,[9] the judge reported the twenty questions now before us stating that the decree confirming the master-auditor's report "so affects the merits of the controversy that the matter ought, before further proceedings, to be determined by the Full Court [and therefore] I hereby report the questions for that purpose in accordance with" G. L. c. 215, § 13. We shall answer the questions to the extent that they are properly before us under that statute. For the purpose of discussing and answering these questions we shall group any two or more which deal with the same subject matter.

1. *Questions Relating to the Guardian's Authority as to Accounts Previously Allowed.* The guardian was "appointed to act as guardian ad litem or next friend for" two named minors and other "persons unborn or unascertained who are or may become interested in" the first account of the trustee, and "to represent their interest in said account." The guardian thereupon embarked on an in-depth investigation of the conduct of the executrix and of the administrator prior to the allowance of their three accounts ultimately closing out the estate and showing the transfer of certain assets to the trustee. He then filed objections to the allowance of the first account of the trustee, brought a petition to revoke the decrees allowing the earlier accounts in the estate, and a petition in equity against the individual respondents for recovery of alleged estate assets. The

[9] The interlocutory decree confirming the master-auditor's report was entered on June 18, 1970, and would ordinarily be the last of the several orders and decrees described. However, it appears that although the guardian's petition to revoke decrees was filed on November 16, 1961, the respondents filed no pleadings or answers thereto until February 4, 1971, when, by leave of court, they filed pleas in bar and demurrers, which were denied and overruled the same day, and answers.

respondents consistently questioned the guardian's right to go behind those settled accounts. By their pleas in bar they alleged that the guardian's two petitions were not within the scope of the authority or duties of the guardian, and as one ground of their demurrers they alleged that the petitions were "beyond the scope of the duties of the guardian." This issue is thus raised by questions 1, 3 and 5, and in part by each of questions 2 and 4, reported by the judge.

The language of the pleas in bar and the demurrers and of the report of the judge would seem to raise the questions (a) whether the appointment of the guardian in connection with the trustee's first account by an order in the usual form authorized him to inquire into the prior accounts of other fiduciaries and to bring the petition in equity and the petition to revoke the decrees allowing those accounts, or (b) whether the guardian required express authorization from the judge before taking such action. The trustee does not argue the question of the guardian's authority in any manner in its brief, and the individual respondents argue it only as a part of their general argument on their pleas and demurrers which we shall consider below. Therefore, since the only brief which specifically argues the question is that of the guardian who argues in support of his action, we are not required to decide this question separately even though it is specifically reported by the judge. However, it is appropriate to note that the judge was aware of the action taken by the guardian and that he upheld the guardian on every occasion when his authority to act was questioned, thus impliedly ratifying the guardian's action to the extent, if any, that it was not authorized by his original appointment.

2. *Questions Relating to the Sufficiency of Allegations in Pleadings as Raised by Pleas in Bar and Demurrers.* The pleas in bar filed by the respondents to the guardian's petitions have been described above. Additionally, the respondents demurred to both petitions on several grounds, one of which, that the guardian acted

beyond the scope of his duties and authority, has been discussed above. The demurrer to the petition in equity also alleged that it did "not set forth facts sufficient to warrant the relief prayed for," and that it was "in fact a collateral attack upon the previous accounts of the executrix and of the administrator . . . which accounts were properly allowed, and such impeachment must be by a direct petition to reopen the prior accounts and to modify the decree." When the guardian reacted to that demurrer by filing a petition to revoke the decrees allowing the accounts, the respondents demurred to that petition on the ground that it did "not set forth facts sufficient to warrant the relief prayed for." By his questions 2 and 4 relating to the demurrers and 3 and 5 relating to the pleas in bar, the judge reports to this court the general question whether he correctly denied the pleas and overruled the demurrers.

The trustee does not argue the questions arising from its pleas in bar and demurrers in any manner in its brief. The individual respondents argue their pleas and demurrers only briefly. As to the guardian's petition in equity they argue that it "constitutes a collateral attack on prior allowed accounts, . . . that a decree of the Probate Court within its jurisdiction is good unless it is set aside and it cannot be attacked collaterally and cannot be set aside in equity even for fraud," citing *Bloom* v. *Bloom*, 337 Mass. 480, 482. The respondents' statements quoted from their brief are correct, but they ignore the fact that after the respondents demurred to the petition in equity the guardian did file a petition to revoke the decrees with the result that he need not rely on the equity petition for a collateral attack on the decrees, but may still rely on it as the vehicle for requiring the respondents to restore assets to the trust if the accounts are reopened and the respondents are found liable.

As to the guardian's petition to revoke the decrees the individual respondents argue that their plea should have been allowed and their demurrer sustained because

(a) the petition does not contain a clear allegation of intentional wrongdoing by the executrix or by her son William, (b) it alleges neither fraud nor manifest error as those terms are used in G. L. c. 206, § 24, and (c) it contains many conclusions of law.

Before stating our answer to the judge's questions to us whether he correctly denied the pleas in bar and overruled the demurrers, we repeat some pertinent dates and occurrences in this now prolonged litigation. The guardian filed his petition in equity on June 29, 1961. The respondents' plea in bar to that petition was denied on September 28, 1961, and their demurrer to it was overruled on November 29, 1961. The guardian filed his petition to revoke decrees on November 16, 1961. The two petitions, together with· the trustee's first account, were all referred to a master-auditor no later than November 30, 1961. By June 7, 1963, the judge found that the hearings before the master-auditor had become so protracted that he ordered bifurcated hearings and reports on the issues of liability and damages. By September 18, 1967, the master-auditor apparently had not completed hearings and report on the liability issue and the judge ordered him to complete that phase without taking any further evidence on damages. The master-auditor filed his report on the liability phase of the litigation on November 15, 1967. Hearings on objections to the report and on motions to recommit followed. On May 12, 1970, all of the objections were overruled and the motions were denied. On June 18, 1970, the judge confirmed the report of the master-auditor. On February 4, 1971, all of the following events occurred: (a) the individual respondents and the trustee filed, and the judge allowed, separate motions asking leave to file pleas in bar, demurrers and answers to the petition to revoke decrees, which petition had been filed by the guardian on November 16, 1961; (b) the respondents filed their pleas, demurrers and answers, and (c) the judge denied the pleas and overruled the demurrers. Nothing in the record sheds any light on this unusual

filing of pleas and demurrers more than nine years after the filing of the petition and more than seven months after the master-auditor's report had been confirmed. The judge then reported his twenty questions to this court on February 25, 1971.

When viewed against this historical background, the judge's 1971 report to this court of questions 2, 3, 4 and 5, asking whether he correctly denied the pleas in bar and overruled the demurrers, thereby ruling that the 1961 allegations in the guardian's petitions were legally sufficient, is an exercise in utter futility. If the judge seriously doubted the correctness of his rulings in this regard he had an opportunity to report them as early as November 29, 1961, before the near decade of legal blood letting had intervened. By 1971 the time had long since passed when this court should be asked to deal with niceties of ancient pleadings to determine whether the allegations were legally sufficient. By 1971 we had the benefit of actual findings by the master-auditor. The real test in 1971 was not whether the 1961 allegations were sufficient, but whether the facts found were sufficient to entitle the guardian to relief. If they were, he would be entitled to ask the court to permit him to amend his pleadings to conform to his proof under our liberal and far-reaching statutory authority given to courts to allow, "at any time before final judgment . . . [any] amendment in matter of form or substance in any process, pleading or proceeding, which may enable the plaintiff to sustain the action for the cause for which it was intended to be brought." G. L. c. 231, §§ 51, 52.

Neither the ends of justice nor the interests of the parties will be served in any way by a present decision by this court on the question whether the judge correctly ruled that the guardian's 1961 allegations were legally sufficient to entitle him to relief. The crucial question is whether the facts found by the master-auditor entitle him to relief. We shall focus instead on that question in later paragraphs of this opinion.

The mere statement of even this skeletal outline of

the tortuous history of this litigation, admittedly viewed in retrospect, should suffice to illustrate the great care with which trial court judges should approach the question whether a particular case should be tried by the court or should be referred to a master or auditor. Even if we must accept chronic court congestion as a fact of judicial life, as indeed it has been for now too long, it is regrettable that many important cases which, by all proper considerations, should otherwise be tried by the court are likely to be referred to a master or auditor for no better reason than the fact that their trial may be protracted. It is also regrettable that the ultimate disposition of many cases referred to masters or auditors for hearing is, by such reference, delayed rather than accelerated, and that the total time and attention which they require from a judge notwithstanding such reference is often no less than would be required if they were tried by the court. It approaches the abdication of judicial responsibility and the undermining of public confidence in the judiciary to have so many of the more difficult, involved and protracted civil trials referred to masters or auditors while judges address themselves to the more routine and pedestrian types of cases. Although the decision to refer cases to masters or auditors is an exercise of judicial discretion (*Bradley* v. *Borden*, 223 Mass. 575, 586; *Stockbridge* v. *Mixer*, 227 Mass. 501, 510), the corresponding responsibility and consequences of a reference are such that the discretion should be exercised most discriminately and reasonably sparingly. See *Garelick* v. *Board of Appeals of Franklin*, 350 Mass. 289, 290.[10]

---

[10] We note that in the Federal courts the discretion of a judge in this regard is very limited. Rule 53 (b) of the Federal Rules of Civil Procedure, 28 U. S. C. Appendix (1970), provides: "A reference to a master shall be the exception and not the rule. In actions to be tried by a jury, a reference shall be made only when the issues are complicated; in actions to be tried without a jury, save in matters of account and of difficult computation of damages, a reference shall be made only upon a showing that some exceptional condition requires it." In *Adventures in Good Eating, Inc.* v. *Best Places to Eat, Inc.* 131 F. 2d 809, 815 (7th Cir.), the court said: "Litigants are entitled to a trial by the court, in every suit, save where exceptional circum-

3. *Questions Relating to Objections to Master-Auditor's Report and to Motions to Recommit Report.* Questions 6, 7 and 10 reported by the judge ask whether he correctly overruled the objections of all parties to the master-auditor's report. It is sufficient for the purposes of this decision to say, in general, that each party objected to those parts of the report which were unfavorable to him, her or it, on the principal grounds that certain subsidiary findings were not supported by the evidence, that certain general findings were not supported by the subsidiary facts found, that some of the conclusions were rulings of law rather than findings of fact, and that some assumptions or rulings of law were incorrect. It would add nothing to our jurisprudence to treat with all of the objections in detail. We have examined all of them and hold that the judge correctly overruled them. Accordingly we answer questions 6, 7 and 10 in the affirmative.

"Since the report shows upon its face all the subsidiary facts which the master [-auditor] had in mind and upon which he based his . . . [general findings], we are in no way bound by . . . [his general findings], and we must take these subsidiary findings together with the inferences that ought to be drawn from them and reach our own conclusion." *Murray* v. *Bateman,* 315 Mass. 113, 117. *McOuatt* v. *McOuatt,* 320 Mass. 410, 411. *Samia* v. *Central Oil Co. of Worcester,* 339 Mass. 101, 122. *Corrigan* v. *O'Brien,* 353 Mass. 341, 346. *LiDonni*

stances are shown. It is a matter of common knowledge that references greatly increase the cost of litigation and delay and postpone the end of litigation. References are expensive and time-consuming. The delay in some instances is unbelievably long. Likewise, the increase in cost is heavy. For nearly a century, litigants and members of the bar have been crying against this avoidable burden of costs and this inexcusable delay. Likewise, the litigants prefer, and are entitled to, the decision of the judge of the court before whom the suit is brought. Greater confidence in the outcome of the contest and more respect for the judgment of the court arise when the trial is by the judge." The court's emphasis on the "burden of costs" may refer to the obligation of the parties to pay for the master's services under the Federal rules. By contrast, the basic compensation of a master appointed by a court of this Commonwealth is paid by the county.

v. *Hart*, 355 Mass. 580, 583. *International Tel. & Tel. Corp.* v. *Hartford Acc. & Indem. Co.* 357 Mass. 282, 287. If the master-auditor made any incorrect rulings of law, or rulings of law which he was not authorized to make, they do not bind us in any way and they will be disregarded. *Sprague* v. *Rust Master Chem. Corp.* 320 Mass. 668, 677, and cases cited. *Smith* v. *Graham Refrigeration Prod. Co. Inc.* 333 Mass. 181, 184. *Moore* v. *Worcester Insulation Co. Inc.* 338 Mass. 44, 47. *Dowd* v. *Capetown House, Inc.* 353 Mass. 244, 246.

Questions 8 and 9 reported by the judge ask whether he correctly overruled the motions of the respondents to recommit the report to the master-auditor. Although the guardian has argued at length against these motions in his brief, the respondents who were the moving parties did not argue the matter in their respective briefs. We take this to mean that they have no interest in having this court consider the denial of their motions. Accordingly, we are not required to answer questions 8 and 9. S.J.C. Rule 1:13, 351 Mass. 738. *Lolos* v. *Berlin*, 338 Mass. 10, 13–14.

4. *Question Relating to Sufficiency of Findings to Vacate Decrees Allowing Prior Accounts — Transfer to Publishing Company.* Question 11 reported by the judge asks whether the facts found by the master-auditor are "sufficient to sustain the guardian ad litem's burden of proof that there was fraud committed by the accountants in the various challenged allowed accounts so that they may be reopened under . . . [G. L. c. 206, § 24]." Section 24 prescribes the notice to be given and procedure to be followed for the allowance by the Probate Court of accounts of fiduciaries. Statute 1938, c. 154, § 1, added the following language which still appears in § 24: "After final decree has been entered on any . . . account it shall not be impeached except for fraud or manifest error." The basic question involved here is whether the conduct of Mrs. Dwight and of her son William as found by the master-auditor constitutes

"fraud" within the meaning of such word as it is used in § 24.

As the first step in answering that question we must determine whether the transfer of the newspaper business from the Holyoke Transcript, Inc., to the Publishing Company constituted a breach of the fiduciary duties of Mrs. Dwight and her son William. We hold that it did.

The general principles governing the conduct of fiduciaries dealing with trust property which are to be applied in judging the conduct of Mrs. Dwight and her son William in this case are clear. In *Bowen* v. *Richardson*, 133 Mass. 293, 296, we said: "The rule is general and fundamental, that no person holding trust funds can be allowed to derive any personal gain or advantage, either directly or indirectly, from the use [or sale] thereof . . . [that] he must account for all the profits arising from such use, if profits are made, . . . [and that t]his rule is applicable to every kind of fiduciary relation: to executors, administrators, trustees, guardians, directors of corporations, and all persons who hold funds in trust for others. It is also applicable to every mode in which such trustees may either directly or indirectly seek to derive a personal gain or advantage from the use of trust funds, whether by using the same in their personal business, or by treating the same as a loan to one or more or all of themselves . . . or to a firm of which they are members, or otherwise. Whatever form the transaction may assume, the salutary rule must be enforced which forbids them from reaping a personal profit from the method which they adopt of investing or managing the trust estate."

The principles quoted above have been reaffirmed or restated and applied in many of our decisions too numerous to cite. In *Boston Safe Deposit & Trust Co.* v. *Lewis*, 317 Mass. 137, 140–141, we restated the principles and added thereto: "Personal gains accruing to a trustee from the transfer of trust property to himself must be accounted for by him even though he was acting

in good faith, unless the beneficiaries knew the nature and effect of the transfer and consented to its being made." In *Jose* v. *Lyman*, 316 Mass. 271, where one of several executors had sold to himself some securities of the estate which had been pledged to him by the testator, but the account of the executors did not disclose the true nature of the act of the pledgee-executor, the court said at p. 279: "The findings of the judge that the executors acted in good faith and that the price paid by Lyman was fair and the result beneficial to the estate, in the light of the other facts found by the judge, cannot avail the executors." Restatement 2d: Trusts, § 170 (1) (2). Scott, Trusts (3d ed.) §§ 170.20, 170.25.

No prolonged discussion is necessary to demonstrate that Mrs. Dwight and her son William violated these long established principles governing the conduct of fiduciaries when they caused the newspaper business to be transferred from the Holyoke Transcript, Inc., to the Publishing Company. When the transfer was made, Mrs. Dwight was the sole executrix and sole beneficiary of the estate which owned 798 out of the 800 outstanding shares of stock of Holyoke Transcript, Inc. The will specifically bequeathed all of these shares to other persons after the death of Mrs. Dwight. She and her son William constituted a majority of the directors of Holyoke Transcript, Inc. She and her son owned 199 of the 200 outstanding shares of stock of the Publishing Company and they constituted a majority of its directors. The transfer was made without consideration paid or payable to the estate or to Holyoke Transcript, Inc., other than the rent payable to the latter corporation as lessor of the newspaper plant. William participated in the transfer with full knowledge of all the facts, and he is chargeable with equal responsibility for its consequences. Neither Mrs. Dwight as executrix, nor William as successor administrator of the estate, ever accounted for or otherwise disclosed the transfer in their several accounts as such fiduciaries.

We are now faced directly with the ultimate ques-

tion whether the breach of duty by the fiduciaries and their failure to disclose the acts constituting the breach in their probate accounts constitutes "fraud" within the meaning of that word as used in G. L. c. 206, § 24. We hold that it does.

Formerly, decrees of the Probate Court allowing interim accounts of fiduciaries did not have the same force and effect as other decrees of that court, and they were subject to review in connection with the allowance of the final account of the fiduciary. "The purpose and effect of St. 1938, c. 154, § 1 [amending G. L. c. 206, § 24], was to make decrees in Probate Courts on interim accounts after compliance with the requirements of the statute as fully effective as decrees entered in those courts in other proceedings which could be revoked only for fraud or manifest error." *Jose* v. *Lyman,* 316 Mass. 271, 280.

The finality accorded to Probate Court decrees and their protection against direct attack by proceedings to vacate them did not originate with the 1938 amendment to § 24. The statute is a recognition of a long established rule based on considerations of public policy. One of the most frequently quoted statements of the rule is the following from the opinion in *Zeitlin* v. *Zeitlin,* 202 Mass. 205, 207: "It is in the interests of justice that, after a trial and final judgment in a case, the matters heard and adjudicated shall not be opened for a further hearing because of a supposed error in the determination of facts by the tribunal that heard the evidence. A contention that some part of the material testimony was false might be made with plausibility in a large proportion of the cases that are tried. A contention that the prevailing party knowingly gave or procured false testimony, upon an issue involved, might be made and strongly supported in a great many cases. It is against public policy to open cases on no other ground than this." To the same effect, see *Renwick* v. *Macomber,* 233 Mass. 530, 533–534, involving an alleged suppression or concealment of material facts, and *Stephens* v. *Lampron,*

308 Mass. 50, 53, involving the alleged secreting of a witness.

The public policy considerations stated in the *Zeitlin* case have never been held to deprive a Probate Court of the power to revoke a decree where the interests of justice require such action. In *Edson* v. *Edson*, 108 Mass. 590, 597, the court said: "It is no doubt true, that a decree or judgment which stands unreversed and in force cannot be called in question or impeached in collateral proceedings, by one of the parties to the original suit; it is a very different proposition to maintain that an innocent party cannot invoke the power of the court by which the original judgment or decree was rendered, to vacate and annul it on the ground that it was procured by a fraud practised on the court to his gross injury." In *Child* v. *Clark*, 231 Mass. 3, involving sham proceedings in the Probate Court without notice to a claimant of real estate involved in a petition for license to sell, we said, at p. 6: "It would be a reproach to our law if such an injustice to the rights of the petitioners could be perpetrated by means of a fraud practised upon the Probate Court (as that court has found), and no redress be afforded. That the Probate Court has a broad power to revoke or correct its decrees on the ground of fraud practised upon the parties or upon the court is too well established to require discussion."

In a continuing line of decisions, this court has carved a number of exceptions out of the general rule stated in the *Zeitlin* case, *supra.* The case of *Child* v. *Clark*, cited in the paragraph above is such a case. In *Sullivan* v. *Sullivan*, 266 Mass. 228, 229, and *Lovell* v. *Lovell*, 276 Mass. 10, 11, the court applied an exception permitting a decree to be vacated where a party has been deprived of an opportunity to make a defence on the merits of a case by accident or mistake or by the negligence of his attorney. In *Parsekian* v. *Oynoian*, 299 Mass. 543, 544–545, this court upheld the legal sufficiency of a petition to vacate a decree allowing a will subsequently alleged to have been a forgery. In *Agricultural Natl. Bank* v.

*Bernard,* 338 Mass. 54, 57, this court said that "a probate decree may be revoked or modified on petition for any reason that would warrant a bill of review in equity, but not for other reasons," and that the Probate Court had "authority to revoke a decree allowing a will where there is due proof of a revocation clause in a later instrument." See *Goss* v. *Donnell,* 263 Mass. 521, 524, *Hilton* v. *Hopkins,* 275 Mass. 59, 63, and *Stein* v. *Clark,* 326 Mass. 767, 769. In *Reynolds* v. *Remick,* 333 Mass. 1, 10, we spoke of the power of a Probate Court to "revoke a decree procured by fraud which induced the court to take a jurisdiction which it did not have." Since the present case presents no question of jurisdiction, we need not further discuss this particular point.

There is yet another exception which we discuss last because of its relevance to the present case. Under this exception a decree of the Probate Court may be vacated if it was procured by the fraud of a party which operated to deprive an interested party of his day in court or of his opportunity to litigate an issue claimed to have been adjudicated by the decree. In some cases, such as *Child* v. *Clark,* 231 Mass. 3, 6, and *O'Sullivan* v. *Palmer,* 312 Mass. 240, the fraud involved consisted of the intentional failure to name known interested parties with the resulting failure to give them notice of the proceeding. See *McLaughlin* v. *Ferrick,* 276 Mass. 180, 182–183. In *Jose* v. *Lyman,* 316 Mass. 271, one of three co-executors sold to himself, at private sale, some securities which the testator had pledged to him as security for a loan, and to protect their value he entered into an agreement with another large holder of the closely held securities that they would not place their blocks of shares on the market for eighteen months. He did not disclose these facts to legatees or the beneficiaries of a testamentary trust under the will. When filing their account the executors included an item which stated that the shares held by the executor in question had been sold and the cash proceeds paid to him on account of his claim. The account did not disclose that the executor was the buyer of the

shares.  The account was allowed on June 23, 1938, after notice to all interested persons and the appointment of a guardian ad litem who assented to the allowance of the account after a full investigation.  On September 24, 1942, a child of the testator who was both a legatee under the will and a beneficiary under a trust set up by the will brought a petition to revoke the decree allowing the account.  This court held that the denial of the petition by the Probate Court was error.  In doing so we said at p. 282, that "[u]pon the facts found, the proper conclusion is that the allowance of the respondents' first account was procured by fraud in law."  We made it clear, at pp. 280–281 of our opinion in *Jose* v. *Lyman, supra,* that our conclusion was based on the fact that the decree allowing the account should be vacated because it came within the category of cases involving decrees "procured by a fraud that operates to deprive an interested party of his day in court."

In *Taylor* v. *Worcester County Natl. Bank.* 361 Mass. 687, 691, we referred to *Jose* v. *Lyman, supra,* as involving "self-dealing by a trustee and failure to disclose." In *Jackson* v. *United States Trust Co.* 360 Mass. 333, 338, we referred to it as involving "the kind of conflict which brings into play the stringent rules against profit from self-dealing."  The case now before us is certainly one of "self-dealing" by fiduciaries and also a "failure to disclose" such self-dealing by their accounts.  If the fiduciaries had disclosed their self-dealing in their probate accounts, the interests of the minor and unborn or unascertained beneficiaries of the trust could have been protected by the guardian ad litem appointed for that purpose, or perhaps by the trustee, before assenting to their accounts.  This failure to disclose operated to deprive these beneficiaries of their day in court on this wrongful conduct of the fiduciaries.  We therefore hold that the present case is controlled by our decision in *Jose* v. *Lyman, supra,* at 282, and that "the proper conclusion is that the allowance of the . . . [fiduciaries'

accounts] was procured by fraud in law." On the facts of this case the conclusion that there was "fraud in law" does not require or depend on any finding of bad faith on the part of the fiduciaries. Compare *Reynolds* v. *Remick*, 333 Mass. 1, 9–10.

Unlike the case of *Zeitlin* v. *Zeitlin*, 202 Mass. 205, 207, in the present case there are no considerations of public policy which should deter this court from denying to a fiduciary, found by the master-auditor to have engaged in wrongful self-dealing with trust assets, the benefits, protection and immunity flowing from the finality usually accorded to a decree of the Probate Court allowing an account.

By their brief the individual respondents argue in one instance that "the *Jose* case should not be followed," and in another instance that "it should be overruled." We reject both arguments. The holding of that case is an important step in maintaining a reasonable balance between the obligations undertaken by the fiduciary when he accepts the position and the right of the beneficiaries of an estate, trust or other fiduciary relationship to receive the benefits due them from the proper discharge of the fiduciary's duties. The rules applied and the results reached in the *Jose* case and in the present case impose no new or additional risk, burden or liability on any fiduciary whose conduct complies with the long established basic principles governing the conduct of fiduciaries in their dealings with trust property.

Accordingly, we answer question 11 in the affirmative as to fraud with respect to the transactions described above involving Mrs. Dwight and her son William as executrix and administrator respectively and as directors of Holyoke Transcript, Inc., and of the Publishing Company, and involving these two corporations.

5. *Question Relating to Trust's Share of Ownership of the Publishing Company.* Question 12 reported by the judge asks whether on the facts found by the master-auditor the trust is entitled to a share of the ownership of

the Publishing Company, and if so, to what share. We answer this question in the affirmative. It is entitled to a one-sixth share of the ownership, this being the same proportion of the total shares of Holyoke Transcript, Inc., bequeathed to the trustee under the will of the testator (the equivalent of 133 out of a total of 798 shares bequeathed by the will, or of 132 out of a total of 793 shares actually distributed after the death of Mrs. Dwight).

6. *Questions Relating to Valley-Photo and Hampden-Hampshire Corporations.* Question 13 asks whether, on the facts found by the master-auditor, "the trust [is] entitled to a share of the ownership of Valley Photo-Engraving Corporation, and if so, to what share is it entitled?" Question 14 is the same with reference to Hampden-Hampshire. We answer questions 13 and 14 in the negative for reasons apparent from the findings of the master-auditor. He did not find these corporations to be, in any sense, the recipients or present owners of any property or assets wrongfully transferred or diverted from the estate or from Holyoke Transcript, Inc., nor did he find that they represent the fruits of any business opportunity which in equity or good conscience should have been exercised and developed by or for the benefit of the estate or of Holyoke Transcript, Inc. As to the photo-engraving business it is clear that for good and sufficient reasons Holyoke Transcript, Inc., decided to get rid of that business, and that it profited, at least indirectly, by its relations with Valley-Photo. As to Hampden-Hampshire, there is no finding that its business, which was radio broadcasting at first and also television broadcasting later, was ever a part of the newspaper publishing business involved in the estate. On the facts found Mrs. Dwight was not legally prevented from developing that business independently of the estate.

By reason of our negative answers to questions 13 and 14, the trust is not entitled to a share of the ownership of Valley-Photo or Hampden-Hampshire. Therefore,

questions 15 through 19 relating to these two corporations and also the Publishing Company will hereinafter be treated and answered only as to the Publishing Company.

In *Perry* v. *Perry,* 339 Mass. 470, 480–481, we said that "a beneficiary of a trust of shares in a family corporation may in appropriate proceedings force an examination of the corporate affairs, and also the equivalent of a stockholders' suit (see [Cahn, Estate Corporations,] 86 U. of P. L. Rev. 136)." In certain respects the present case was tried as though it were a minority stockholders' suit. See *Samia* v. *Central Oil Co. of Worcester,* 339 Mass. 101, 122–124. The guardian appeared to be pressing the claim of contingent beneficiaries of a trust holding a minority interest in Holyoke Transcript, Inc., when presenting evidence of the transactions between that corporation and the other three corporations: the Publishing Company, Valley-Photo and Hampden-Hampshire. The intercorporate transactions were fully litigated and we have already discussed those involving the Publishing Company. As to Valley-Photo and Hampden-Hampshire, the guardian argues that, in addition to a share of ownership, the trust is entitled to relief against each because (a) they owe Holyoke Transcript, Inc., rent either not paid or forgiven, and (b) they owe Holyoke Transcript, Inc., and perhaps the Publishing Company interest on money loaned to them either directly or through Mrs. Dwight who in turn loaned it to them.

The findings of the master-auditor are insufficient to establish any liability for rent allegedly due. On the other hand, the loans were substantial and they were outstanding in part for a number of years. In a similar situation, we said in *Perry* v. *Perry,* 339 Mass. 470, 483, that "on the facts before us no basis appears for the corporation to forego interest on loans to officers which were outstanding for any substantial period and were not made for the benefit of the [lending] corporation." The same applies to the several loans made by Holyoke Transcript, Inc., or the Publishing Company to or for the use and benefit of Valley-Photo and Hampden-Hamp-

shire and on which the latter corporations paid no interest. The amount of interest thus due is to be determined by the Probate Court, and appropriate orders should be entered for payment thereof to the respective lending corporations.

Since the estate of Mrs. Dwight is not a party to these cases we make no comment on whether it would be liable to Holyoke Transcript, Inc., for interest on money which she borrowed from that corporation.

7. *Questions Relating to Nature and Extent of Relief as to the Publishing Company.* Questions 15 through 19 reported by the judge relate to the nature and extent of relief to which the trust is entitled. We answer these questions below only as to the Publishing Company.

*Question 15.* This question asks whether, if the trust is entitled to a proportionate share of the ownership of the Publishing Company, the share is to be paid in the form of stock of that corporation or its equivalent value in cash. The guardian's petition in equity, by its third prayer, seeks an order that the individual respondents "give over, and transfer to, said testamentary trust said shares as the Court shall find are due and owing to it" of the Publishing Company and other corporations. We do not answer this question beyond noting the guardian's prayer quoted above. We intimate no opinion on whether, assuming an appropriate amendment to the petition, the relief ordered could be in the form of money damages equivalent to the value of the shares of stock. That question is not now before the court on the pleadings.

*Question 16.* This question asks whether the trustee or the beneficiary has the right to determine whether the trust shall be paid its proportionate share of the ownership of the Publishing Company in shares of stock or in cash. For the reasons stated in answer to question 15, we do not answer this question.

*Question 17.* This question asks whether the trust's right to a proportionate share of the ownership of the Publishing Company accrued at the death of Mrs. Dwight

or at some other time. The trust's right to receive distribution of its proportionate share was effective at the death of Mrs. Dwight, the executrix and life tenant. We are not asked when the trust's right thereto became vested, and we intimate no opinion thereon.

*Question 18.* This question asks whether the trust is entitled to a proportionate share of "all dividends declared from the date of the death of the executrix and life tenant, or some other time, to the present," in addition to the share of the ownership. It is entitled to dividends declared after the death of Mrs. Dwight on its proportionate part of the shares of the Publishing Company.

*Question 19.* This question asks whether the trust is entitled to interest on such dividends, and for what period. It is entitled to interest on dividends declared on its proportionate part of the shares of the Publishing Company after the death of Mrs. Dwight, from their payment by the company to the date the trust ultimately receives them.

8. *Question Relating to Alleged Negligence of Trustee.* Question 20 asks whether the master-auditor's finding that the trustee "was negligent in performing its duties . . . [is] supported by the subsidiary facts found by . . . [him] and by his summaries of evidence." We answer this question in the negative.

The master-auditor made lengthy findings describing in detail the business relationships between the trustee and the Dwight family and the various corporations in which the family was interested, and also describing in detail many things which the trustee did in its capacity as trustee in this case. There are many findings of facts known to employees of the trustee and the master-auditor attributes such knowledge to the trustee. From these detailed findings the master-auditor makes general findings that the trustee was negligent (a) in assenting to the second and final account of Mrs. Dwight as executrix and to the first and final account of her son William as administrator, (b) in assuming that the allowance of the two accounts precluded any right to attempt recovery

from the Publishing Company, Valley-Photo and Hampden-Hampshire for the benefit of the trust, and (c) in relying on the valuation placed on the 132 shares of stock of Holyoke Transcript, Inc., by the three appraisers appointed for that purpose by the Probate Court, the appraisal having been made without reflecting any interest in the Publishing Company, and then in selling those shares in part to Holyoke Transcript, Inc., and in part to Valley-Photo at their appraised valuation.

It is not disputed that if the trustee was negligent with resulting damage to the trust or its assets, it is liable therefor. The principal issue is whether the subsidiary facts found by the master-auditor warrant a general finding that the trustee was negligent. We hold that they do not.

The standard of conduct required of a trustee has been stated in numerous decisions of this court over many years. Although many of the decisions deal particularly with the investment of trust funds, their language applies generally to the duties of trustees. As early as 1830, this court said in *Harvard College* v. *Amory*, 9 Pick. 446, 461, 465: "All that can be required of a trustee . . . is, that he shall conduct himself faithfully and exercise a sound discretion." "Trustees . . . [should] conduct themselves honestly and discreetly and carefully, according to the existing circumstances, in the discharge of their trusts." After quoting some of the above language, we said, in *Kimball* v. *Whitney*, 233 Mass. 321, 331: "Good faith and sound discretion, as these terms ought to be understood by reasonable men of good judgment, were thus made the standard by which the conduct of trustees is to be measured. That is a comprehensive principle. It is wide in its scope. It is not limited to a particular time or a special neighborhood. It is general and inclusive, so that while remaining itself fixed, it may continue to be a safe guide" in changing circumstances.

In *Berry* v. *Kyes*, 304 Mass. 56, 58–59, we said that a trustee was "required to act in good faith, with reasonable prudence and sound judgment, guided by a due and

rational appreciation of the fiduciary obligation and actuated by an honest, intelligent and diligent effort to discharge fully the responsibility which it had voluntarily accepted." *Taft* v. *Smith,* 186 Mass. 31, 32. *Gardiner* v. *Rogers,* 267 Mass. 274, 278. *McInnes* v. *Whitman,* 313 Mass. 19, 30. *Young* v. *Tudor,* 323 Mass. 508, 515.

Many wills or other instruments creating trusts include exculpatory clauses limiting the liability of trustees in connection with the discharge of their duties. In speaking of such clauses in *New England Trust Co.* v. *Paine,* 317 Mass. 542, 550, we said: "The law does not look with special favor upon attempts to impair the breadth and strength of the safeguards which experience has erected for the protection of those whose property has been confided to the good faith and sound judgment of trustees. And certainly this general attitude should not be softened first for the benefit of trust companies and professional trustees who hold themselves out as fully conversant with the duties of trustees and fully competent to perform them."

The will creating the trust in the present case contains no exculpatory clause and it is therefore governed by the general principles discussed above. That is the yardstick by which we are to measure the acts of the trustee which the guardian now contends were negligent. That yardstick is to be applied to the facts and circumstances existing at the time of the acts complained of, without the benefit of any knowledge or experience gained through the many years since then. We must judge the acts of the trustee from the position which it occupied when it acted, and not by hindsight from our present vantage point.

The first act of the trustee which the guardian contends was negligent was its assent to the allowance of the second and final account of Mrs. Dwight as executrix and to the first and final account of her son William as administrator. The trustee was in effect representing the interests of the beneficiaries of the trust in the matter of the allowance of those accounts, and therefore no guard-

ians ad litem were appointed at that time. *Claflin, petitioner,* 336 Mass. 578, 581–582. *Second Bank-State St. Trust Co.* v. *Linsley,* 341 Mass. 113, 117. At that time the trustee had the right to rely on the fact that the first account of the executrix had been allowed and the decree allowing it had not been revoked. The previous inventory showed that the estate started with 798 shares of stock of Holyoke Transcript, Inc., and the first account showed the estate still owned 793 such shares. The accounts to which the trustee assented showed those 793 shares and the later of the two accounts showed the distribution to the trustee of 132 shares in accordance with the will. The trustee was not required to make an audit of the books and records of Holyoke Transcript, Inc., to determine whether, at the time of distribution of the shares, it still owned all of the assets which it owned when the executrix was appointed. Its failure to do so was not negligence. The fact that the guardian later made such a thorough and revealing investigation does not require a conclusion that the trustee was negligent for not having done so. The trustee cannot be found in 1973 to have been negligent in 1957 and 1958 for assuming that there was finality to Probate Court decrees allowing accounts.

The master found many detailed facts in isolation from which he drew strained inferences, and then stacked inference upon inference to conclude that the trustee was negligent in not taking action to recover assets of the trust from the present respondents. The conclusion of negligence was not warranted. It is true that the Dwight family and its various corporations had been customers of the trustee in its banking business, and that in that connection the trustee had gained some knowledge and information about their operations. However, that does not add enough to the other evidence to constitute a base to support a general finding that the trustee was negligent in accepting the 132 shares of stock of Holyoke Transcript, Inc., without demanding shares in other Dwight family corporations. Judging from hind-

sight it may be appropriate to suggest that all parties might have been better served if the trustee were someone who had no business ties with the other parties in interest, but that is not the question now before us.[11]

The trustee's inventory listed the 132 shares of Holyoke Transcript, Inc., stock at $760 a share. That was the amount at which the shares were appraised by three appraisers appointed by the Probate Court. The trustee sold the shares at that price. The guardian contends, and the master found, that the trustee was negligent in relying on the appraisal without having another appraisal made. The mere fact that the appraisers were the trustee's vice-president, a real estate and insurance broker and a certified public accountant who had business relations with Holyoke Transcript, Inc., does not mean that the trustee was negligent in relying on their appraisal. In *Exchange Trust Co.* v. *Doudera,* 270 Mass. 227, 228–229, we held that a trustee selling trust property "can be held accountable for an amount larger than that actually received only when it acts in bad faith or fails to exercise reasonable skill, prudence and judgment." By that standard, the trustee cannot be held accountable for more than the $760 which it received for each of the 132 shares

---

[11] As early as November 25, 1960, when the guardian filed his report objecting to the trustee's first account, it was obvious that the guardian was claiming that the trustee had failed to take action to recover assets to which it was entitled but which allegedly had been diverted to the individual respondents or to corporations controlled by some of them. This was confirmed no later than June 29, 1961, when the guardian filed his petition in equity formally making such allegations and claim. Starting on September 11, 1961, when the respondents, including the trustee, filed their plea in bar to the petition in equity, the trustee elected to be represented by the same firm of lawyers which was representing the individual respondents. This continued until September 18, 1967, when another firm of lawyers filed an appearance for the individual respondents in the petition in equity and the petition to revoke decrees. That was the same date on which the judge ordered the master-auditor to limit his hearings and report to the issues other than damages and to file his report on those other issues. The report was filed on November 15, 1967. The first law firm withdrew its appearance for the individual respondents on October 2, 1970. These facts may have a bearing on whether the trustee should be allowed to continue to serve in that capacity, but that is a matter to be determined by the Probate Court. It should be noted that counsel for the individual respondents before this court were not their counsel during the proceedings in the Probate Court described in this opinion.

of stock which it sold. Admittedly, we can now look back and agree that it might have been desirable to have another appraisal by totally disinterested persons, but that does not require a conclusion that the trustee was negligent for not obtaining one.

Although we have now answered all of the questions reported by the judge, as to some of them we have done so despite the fact that they may not be within the power of a judge to report under G. L. c. 215, § 13. Each of the first eleven questions is directly related to "an interlocutory decree or order" entered by the judge. The same cannot be said for many of the last nine questions. As to those questions we would ordinarily apply the rule that when the discretion conferred upon judges "in reporting cases before they are ripe for final judgment . . . [is] too generously exercised, and . . . moot, speculative or subsidiary questions are reported, they would not be considered." *John Hetherington & Sons, Ltd.* v. *William Firth Co.* 212 Mass. 257, 259. *Terry* v. *Brightman,* 129 Mass. 535, 537–538. *Commonwealth* v. *Henry's Drywall, Inc.* 362 Mass. 552, 556. However, because of the many years that this case has now been pending, and since all of the questions have been argued, we have elected to answer all of the questions in the hope that doing so may help to dispose of the controversy without further delay. *Wellesley College* v. *Attorney Gen.* 313 Mass. 722, 731.

Further proceedings at the Probate Court level will be required. Although we have noted the discretion reposed in a trial court judge to refer cases to masters or auditors, we now add that we consider it desirable that the Probate Court give serious consideration to the expeditious completion of the trial of this case before a judge in order to avoid any further delay which seems to be inherent in the reference of cases to masters or auditors.

The case remains in the Probate Court for further proceedings consistent with this opinion.

*So ordered.*