RALPH C. ERICKSON & others[1] *vs.* CITY OF WALTHAM.

Middlesex. November 15, 1973. — July 19, 1974.

Present: HALE, C.J., GRANT, & ARMSTRONG, JJ.

*Municipal Corporation,* Officers and employees, By-laws and ordinances. *Police.* *Equity Jurisdiction,* Laches.

In the circumstances, for the purposes of G. L. c. 147, § 17B, day duty police officers of a city were on duty during fifteen minutes allowed in each shift for "coffee break" and "personal needs," but, during a half-hour lunch period allowed in each shift, were off duty when they were not required to perform emergency work. [439-443]

G. L. c. 147, § 17B, did not permit "averaging," whereby a night duty police officer of a city in a period of eight weeks worked five shifts in each of six of such weeks, four shifts in another week, and six shifts in another week; and where for each of the latter two weeks he was paid as if he had worked five shifts totaling forty hours, the city was obliged to pay him overtime for the sixth shift in the long week, but was entitled to offset the overtime paid in the short week. [444-445]

No error appeared in a city's computation of the "hourly rate" or "hourly basis" of a police officer's regular compensation for the

[1] One hundred thirty-six police officers presently or formerly employed by the city of Waltham.

purposes of overtime pay under G. L. c. 147, § 17B, or a certain ordinance by dividing his annual salary by the number of days in the year, then multiplying the quotient by seven, and then dividing the product by forty. [445-447]

For the purposes of a city ordinance providing for an "additional day's pay" in lieu of an additional day off when a police officer was required to work on a holiday or his regular day off fell on a holiday, and of a later ordinance providing that holiday pay should "be governed by" G. L. c. 147, § 17A, an officer was entitled to have the "additional day's pay" computed on the basis of a working day at one fifth of his week's pay, rather than on the basis of a calendar day at one seventh of his week's pay, whether or not § 17A had been accepted by the city; but the computation should be based on the rate of his regular compensation, not a higher rate provided for overtime compensation. [447-450]

The facts did not support the defense of laches raised by a city in a suit in equity against it by police officers seeking declaratory relief and certain compensation in excess of that paid to them. [450-451]

BILL IN EQUITY filed in the Superior Court on March 26, 1970.

The suit was heard by *Mitchell, J.,* on a master's report.

*William J. Bannan, Jr.,* City Solicitor, for the city of Waltham.

*Charlotte Anne Perretta* for the plaintiffs.

ARMSTRONG, J. This bill in equity was brought by the plaintiffs, members of the police department of the city of Waltham (city), to secure declaratory relief, certain forms of interlocutory injunctive relief not here relevant, and compensation in excess of that previously paid them for overtime and for paid holidays during the period April 1, 1964, to April 1, 1970. The case was referred to a master, who found the plaintiffs entitled to additional compensation in several categories of claims. After confirmation of that report, a final decree was entered which made declarations of general principles governing the rights of the plaintiffs to the additional compensation sought, and then, presumably applying those principles to the situations of the individual plaintiffs, declared the city indebted to them in varying dollar amounts, which

were ordered paid.[2]   The case comes to us on the city's appeal from the final decree.

As no objections were made by either party to the master's report, and no appeal was claimed from the interlocutory decree confirming the report, the latter conclusively established the master's findings between the parties. *Limoli* v. *Accettullo*, 358 Mass. 381, 382 (1970). Those findings cannot be set aside unless mutually inconsistent, contradictory, or plainly wrong. *Gil-Bern Constr. Corp.* v. *Medford*, 357 Mass. 620, 623 (1970).   However, the master's "conclusions of fact, based on inferences from the subsidiary findings, are open to review not only by the trial court but also by this court." *LiDonni, Inc.* v. *Hart*, 355 Mass. 580, 583 (1969).   *O'Brien* v. *Dwight*, 363 Mass. 256, 281 (1973).   This is true notwithstanding the fact that no objections were appended to the master's report. *U. S. Fidelity & Guar. Co.* v. *English Constr. Co.* 303 Mass. 105, 111 (1939).   The case of *Smigliani* v. *Smigliani*, 358 Mass. 84, 87 (1970), cited by the plaintiffs, holds nothing to the contrary.

## Overtime Compensation Claims

Three of the claims advanced by the plaintiffs related to overtime compensation.   These claims arose out of a work schedule which established three shifts: a "day shift," commencing at 7:45 A.M. and terminating at 4:30 P.M., a total of eight hours and forty-five minutes; a "first half night shift", commencing at 4:30 P.M. and terminating at 12:30 A.M., a total of eight hours even; and a "second half night shift", commencing at 12:30

---

[2] There was no evidence taken before the master or the Superior Court concerning the facts underlying the particular dollar amounts determined for each plaintiff.   Rather, the parties stipulated before the master that they would not introduce such evidence, and would themselves calculate the dollar amounts on the basis of the court's resolution of the various matters of principle in dispute.   No objection is made by the city to the calculations of the dollar amounts in the final decree, only to the principles which underlay those calculations.

A.M. and terminating at 7:50 A.M., a total of seven hours and twenty minutes. Officers assigned to the day shift are claiming a right to overtime compensation for the time in excess of eight hours required of their shift alone. Officers assigned to the night shifts, who alternated daily between the first half and second half night shifts, served after January 22, 1967, on a rotating schedule which was of eight weeks' duration and which required officers to work five days in six of those weeks, four days in one of those weeks and six days in the remaining week. They are claiming to be entitled to overtime pay for the sixth day which occurred once in each eight week cycle.[3]

General Laws c. 147, § 17B, inserted by St. 1956, c. 349, and accepted by the city in 1963, was in effect during the entire period in dispute. In relevant part it provides that

> "The services of all regular or permanent police officers . . . shall be restricted to five days and to forty hours in any one week; provided that service in excess of the aforesaid days and hours may be authorized . . . and the officer performing such additional service shall be compensated at the hourly rate of his regular compensation for his average weekly hours of regular duty or such higher rate as may be determined by the person or persons authorized to establish pay scales . . .."

### Day Shift Overtime

Although the city acknowledges that the day shift extends to forty-three hours and forty-five minutes each

---

[3] They apparently also claimed to be entitled to twenty minutes overtime each time they worked the first half night shift due to delay caused by the pickup wagon in retrieving men from their posts. The master so found, but the judge, before confirming the report modified it by disallowing this claim of additional compensation. The correctness of the judge's action is not questioned in this court by the plaintiffs.

week, it argues that of each eight hour and forty-five minute shift one half hour represented off-duty time for lunch and fifteen minutes represented off-duty time for "'coffee break' and personal needs."

The master found that "General Regulations Subsection 1A" of the police department regulations states in part: "All officers may take one-half hour lunch period, to be taken at the discretion of the officer so as not to interfere with his duties." Absent some indication to the contrary we assume this regulation applied during the entire six-year period at issue.

Prior to 1967, officers on foot patrol, or "route men," had no specific lunch period. Rather, a route man was required to notify headquarters when he wished to take his half hour for lunch, and to receive permission from headquarters before doing so. He was also required to inform headquarters where he would be during that half hour, and could not eat his lunch at a place off his route without permission. After January 22, 1967, two specific half hour lunch periods were established, but a route man was still required to notify headquarters, receive permission, and, unless otherwise permitted, remain on his route during his half hour period. In October, 1967, the department introduced walkie-talkie communication between route men and headquarters and introduced a new lunch system, under which there was posted at headquarters a regular lunch schedule which apparently assigned a specific half hour lunch period for each route man. The latter could thereafter take his lunch without notifying headquarters, and was not required to remain on his route during his lunch period.

The divergence in practice before and after October, 1967, is not reflected in the master's subsidiary findings relating to lunch periods for officers assigned to cruisers. So far as we are told, they were at all times assigned specific, staggered lunch periods during which they were permitted to eat at home or elsewhere. Although cruiser

men were required to notify headquarters when taking lunch, during that time the cruiser was left unattended with the radio shut off.

Officers assigned to station house duty worked in normal complements of four, with three required to be on duty at all times. These officers worked out the time and order of lunch among themselves. Such officers were free, subject to release (we assume as to time only) by the officer in charge, to leave the station, or instead could have their lunches brought into the station.

The master also found that all officers were subject to be called upon to perform emergency duties during their lunch periods, and that "[p]olice officers [whether route men or all officers is not clear from the context] while on lunch period have had lunch interrupted because of duties or emergencies requiring the officer to perform in his official capacity."

No contention appears to be made that coffee breaks or breaks for personal needs rest on a regulation or on an established custom. Rather, the city's contention appears to be that officers generally spend at least fifteen minutes of each shift on such pursuits. The master made no finding in that respect.

The master drew the following conclusions: (1) "that all day shift police officers are subject to call and actually under the control and direction of the . . . Department, and thereby on duty, during their one-half hour lunch period, coffee breaks and when attending to calls of nature"; and (2) "that all day shift police officers . . . working between the hours of 7:45 A.M. and 4:30 P.M. . . . are continually on duty and employed eight and three-quarters hours during those hours."

The master's conclusion is correct with respect to breaks for coffee and personal needs. There are no subsidiary findings to sustain the city's contention that during such breaks officers are not on duty; and as a practical matter it would be very difficult administrative-

ly to treat a multiplicity of irregular, short breaks as off-duty time. See *Mitchell* v. *Greinetz,* 235 F. 2d 621, 625 (10th Cir. 1956).

We do not agree, however, with the master's conclusion that the half hour lunch period must be included as time spent on duty. Rather, we construe the departmental regulation, viewed in the light of the practice under it, as having given each man a half hour off duty for lunch. The regulation is not altogether clear in this respect, and the plaintiffs argue that the language "so as not to interfere with his duties" implies that the men were on duty throughout the lunch period. We feel there is a distinction, however, between being permitted to eat lunch in such manner that it does not interfere with one's duties, as in *Albright* v. *United States,* 161 Ct. Cl. 356, 361-362 (1963), and being permitted to take a half hour lunch period in such manner that it does not interfere with one's duties. The implication of the latter, read in the light of the earlier practice of not having fixed lunch periods, is merely that the selection of one's half hour lunch period should be timed so as not to interfere with duties known beforehand.

This case falls within the rule that "[g]enerally speaking, time available for, or spent, sleeping and eating is non-compensable, even where the employee is required to be on the employer's premises. This rule is now well established." *Rapp* v. *United States,* 340 F. 2d 635, 642 (Ct. Cl. 1964). [4]

The master's findings that officers were subject to call back to duty during lunch, and in fact were sometimes (how frequently does not appear) so called back, is not

---

[4] *Rapp* v. *United States* and the other Court of Claims cases cited in this opinion were decided under the Federal Employees Pay Act of 1945, as amended (5 U. S. C. § 911 [1958]), which reads in part: "All hours of work officially ordered or approved in excess of forty hours in any administrative work-week . . . shall be considered to be overtime work and compensation for such overtime work . . . shall be at the following rates . . .."

inconsistent with the city's contention that when not so called the officers were off duty. *Bantom* v. *United States*, 165 Ct. Cl. 312, 320 (1964), cert. den. 379 U. S. 890 (1964). The fact that there were at various periods no fixed times for lunch, that during some periods the plaintiffs were restricted as to the places lunch could be taken, and that (in the case of officers assigned to station house duty) officers frequently had their lunches brought into the station house, do not require a conclusion that the officers involved were on duty during their lunch times. *Bowling* v. *United States*, 181 Ct. Cl. 968, 976-977, 980 (1967). This case is different from such cases as *Missouri, K. & T. Ry.* v. *United States*, 231 U. S. 112 (1913), *Armour & Co.* v. *Wantock*, 323 U. S. 126 (1944), and *Albright* v. *United States*, 161 Ct. Cl. 356 (1963), in all of which employees performed their duties during the periods claimed for. We see no evidence in this case that the plaintiffs were normally expected to be performing their regular duties during the period reserved for lunch. On the contrary, they were subject to call back to duty when it was necessary for them to serve. To the extent that they were called upon to perform duties during their lunch periods, and did so, such time would be compensable. (*Bantom* v. *United States, supra*, at 320; *Bowling* v. *United States, supra*, at 980), and, if recalls resulted in excesses of forty hours in any week, overtime would be required.

Officers who worked the day shift are therefore entitled to be credited with eight hours and fifteen minutes for each full shift worked, and, in addition, such time as they are able to show was spent on emergency duties during their lunch periods, provided that they were not able to finish their lunch periods after the emergencies were over.

### Night Rotation Shift Overtime

On January 22, 1967, officers assigned to the night shift were put on a rotation cycle of eight weeks dura-

tion. In six of those weeks an officer would work five days. In the remaining two weeks of the cycle, the officer would work ten days, but six of those days were in one week, and four in the other. He would be paid in each of those weeks as if he had worked five shifts totaling forty hours. In other words, he received no overtime compensation for the last day of work in the six day week. Conversely, if he were called upon to work any time in excess of his four regular shifts in the four day week he would be paid overtime for that work, although he had not yet worked the five shifts or forty hours after which overtime pay is required under the provisions of § 17B.

The city contends that § 17B permits "averaging," i.e., applying the provisions of § 17B not to the shifts and hours in a particular week, but to the average shifts and hours over a reasonable period of weeks. It further contends that, if "averaging" is not allowed, it should be permitted to offset against its obligation to pay overtime for the six day weeks the overtime compensation it actually paid for the four day weeks. The master and the court below rejected both contentions.

General Laws c. 147, § 17B, does not appear to be ambiguous. Its plain wording places a five day, forty hour ceiling on the number of days and hours worked in a single week without overtime compensation. The practice of averaging is contrary to its purpose in that it would permit a city or town which accepts § 17B not to compensate an officer for services rendered in excess of five days or forty hours in one week so long as the officer receives a corresponding reduction in the number of days or hours he is required to work in another week. Had the Legislature intended to permit such a practice, it could have so indicated in clear and unambiguous language, as it did in G. L. c. 48, § 58B, which provides that "the average weekly hours of duty in any year [for firemen] . . . shall not exceed forty-eight in number," and again in G. L. c. 149, § 30C, which

provides that "[t]he service of all members of the uniform branch of the state police . . . shall consist of an average of forty hours per week over a period of one or more work weeks not in excess of eight." In contrast, § 17B states that services rendered by a police officer "shall be restricted to five days and to forty hours in any one week." We read this language as explicitly excluding the practice of averaging. The reference to "average" in the part of § 17B which deals with the computation of overtime compensation is not relevant to the question before us. And although the Supreme Judicial Court has held that a related section, G. L. c. 147, § 17C, "permits averaging the hours worked in a reasonable number of weeks" (*Bartley* v. *Watertown,* 350 Mass. 622, 628 [1966]), the clear language of § 17B seems to us to preclude a similar result.

Therefore, the city is required to pay overtime to men on the rotating night shift for the sixth day worked in the long week of the eight week rotation. But it follows from this that the city must be permitted to offset certain overtime paid to the same officers during the short week of that rotation — namely, overtime that was paid during the short week for shifts not in excess of five and for hours not in excess of forty. The only basis for paying overtime for such shifts and hours in the first place was that if the hours could be averaged the statute (§ 17B) required it. If, as we hold, § 17B does not permit averaging, then it clearly does not require overtime compensation for the fifth day, or for hours less than forty, in the short week of the rotation cycle. It would be both illogical and inequitable to permit the plaintiffs to exact overtime for the long week without refunding overtime for the short week.

### Computation of Overtime Compensation

General Laws c. 147, § 17B, provides that overtime for each officer should be compensated "at the hourly

rate of his regular compensation for his average weekly hours of regular duty or such higher rate as may be determined by the person or persons authorized to establish pay scales in the respective police departments." The parties agree that overtime worked from April 1, 1964, to August 26, 1969, is to be compensated "at the hourly rate of his regular compensation for his average weekly hours of regular duty," as provided for by § 17B, and, after March 27, 1969, also by the city's ordinance No. 22456[5]; and that overtime worked between August 26, 1969, and April 1, 1970, is to be compensated at time and a half, as provided for by the city's ordinance No. 22569.[6] The master found that in fact the city paid "straight time" before August 26, 1969, and time and a half thereafter. The parties disagree, however, as to the method by which the city should have made computations under those ordinances.

The master found that the city in fact computed "regular compensation for his average weekly hours of regular duty" (G. L. c. 147, § 17B, and ordinance No. 22456), and "the base pay for a regular working week" (ordinance No. 22569) by dividing the annual salary of each officer by the number of days in the year (to arrive at a "daily rate"), and then multiplying the quotient by seven. The product was then divided by forty (agreed by the parties to be the proper method of computing the hourly rate from the weekly rate) to arrive at the hourly rate to be used as the basis for paying overtime. The master ruled that this method was in violation of § 17B,

[5] Section 2-37A of the ordinance reads: "Applicable to members of the Police & Fire Departments and Fire Alarm Operators: Overtime shall be paid on a straight time hourly basis computed on the base pay for a regular working week regardless of any shift differentials."

[6] Ordinance No. 22569 became effective on August 26, 1969, and provided: "Section 2-37A of ordinance 22456 is hereby amended by striking out the first sentence of said section and inserting in its place the following: Overtime shall be paid at the rate of one and one-half times the hourly basis computed on the base pay for a regular working week regardless of shift differentials."

but he did not suggest an alternative method in any coherent manner (unless, perhaps, that the city should divide an officer's annual salary by the number of weeks in a year, and then divide the quotient by forty to arrive at the hourly rate, which appears to us to amount to the same thing, at least assuming that the fractional week is not omitted in the mathematics). We see no impropriety in the city's continuing to employ the method that the master found it uses.

## Holiday Pay

On the other hand, we are unable to accept the city's contention that it correctly computed holiday pay.

The master found that police officers in Waltham regularly worked on holidays, unless the holiday happened to fall on one of the officer's regular days off, and that when a holiday fell on an officer's regular day off the officer was never given an additional day off. In either case the city paid the officer an amount of money equal to one seventh of the officer's weekly pay, computed as stated above. The plaintiffs contend, and the master and the Superior Court agreed, that the plaintiffs were entitled to have the holiday compensation computed on the basis of one fifth of each officer's weekly pay. In addition, the master and the judge appear to have ruled that to the extent that the holiday hours so compensated, when added to the hours actually worked in the same week, exceeded forty, the holiday compensation, after August 26, 1969 (the effective date of time and a half overtime compensation for Waltham police), must be computed on a time and a half basis.

The master found that Waltham "adopted General Ordinances Chapter 14, Section 14-5.1, . . . on . . . [February 12, 1963, which] was applicable to the . . . [plaintiffs] through [August 26, 1969], and that it provides as follows: 'When any police officer who

regularly works five or more days a week is required to work on January first, February twenty second, April nineteenth, May thirtieth, July fourth, the first Monday of September, October twelfth, November eleventh, Thanksgiving day or Christmas day or the day following when any of the five days first mentioned, or October twelfth, November eleventh or Christmas day, when the same occurs on Sunday, or where the regular day [off] of any such police officer falls on any of the aforementioned holidays, he shall be given an additional day off, or, if such additional day off cannot be given because of personnel shortage or other cause, he shall be entitled to an additional day's pay in lieu thereof.'"

In addition, the master found (apparently on the basis of an allegation in the plaintiffs' bill, admitted in the answer, to the effect that Waltham's ordinance No. 22456 provided that "[h]oliday pay for members of the police department shall be governed by the applicable provisions of [G. L. c. 147, § 17A] . . .") that G. L. c. 147, § 17A,[7] "was effective and became applicable to the . . . [plaintiffs] on [March 27, 1969] . . .."

---

[7] In relevant part G. L. c. 147, § 17A, as amended through St. 1968, c. 704, provided: "If any police officer of a city or town is required to work on January first, February twenty second, April nineteenth, May thirtieth, July fourth, the first Monday of September, October twelfth, November eleventh, Thanksgiving day or Christmas day, or the day following when any of the five days first mentioned, or October twelfth, November eleventh or Christmas day, occurs on Sunday, he shall be given an additional day off, or, if such additional day off cannot be given because of personnel shortage or other cause, he shall be entitled to an additional day's pay; provided, that, in the case of any such police officer whose regular day off, vacation day or a day on which he is absent from duty because of injuries sustained in line of duty falls on any of the aforementioned holidays, an additional day off shall be allowed, or payment in lieu of one day shall be allowed. Such additional day's pay shall be based on the hourly rate of his regular compensation for his average weekly hours of regular duty or such higher rate as may be determined by the person or persons authorized to establish pay scales in the respective police departments. This section shall take effect in . . . [certain] cities by vote of the city council . . .."

The city contends that the reference to "the applicable provisions of [G. L. c. 147, § 17A]" in the ordinance did not constitute an acceptance of § 17A by it; that the provisions of § 17A relating to the method of computing the "additional day's pay" are not made applicable in Waltham by the ordinance; and that its method of computing the "additional day's pay" called for under Waltham's General Ordinances, c. 14, § 14-5.1, was permissible under the more general terms of the latter ordinance.

It is apparent that the city's computation of a day's pay was predicated upon a calendar day rather than a working day. That method is at variance with the great weight of authority which requires compensation to be measured by working hours or working days rather than by calendar days. See *Overnight Motor Co.* v. *Missel,* 316 U. S. 572, 580, and n. 16 (1942); *Walling* v. *Helmerich & Payne, Inc.* 323 U. S. 37, 40 (1944); *Seneca Coal & Coke Co.* v. *Lofton,* 136 F. 2d 359, 362 (10th Cir. 1943), cert. den. 320 U. S. 772 (1943); *General Elec. Co.* v. *Porter,* 208 F. 2d 805, 812 (9th Cir. 1953), cert. den. 347 U. S. 951 (1954); *Triple "AAA" Co.* v. *Wirtz,* 378 F. 2d 884 (10th Cir. 1967), cert. den. 389 U. S. 959 (1967). See also *Bay Ridge Co.* v. *Aaron,* 334 U. S. 446, 459-460, 464 (1948); *Biggs* v. *Joshua Hendy Corp.* 183 F. 2d 515 (9th Cir. 1950). Absent language in the ordinance clearly indicating that the city meant to adopt an unusual and atypical method of computing "a day's pay," we hold that the ordinance requires the more customary interpretation. The same result is required after March 27, 1969, by virtue of the ordinance which incorporated the principles of § 17A, whether that section was accepted by Waltham or not.

As no contention is made that any of the obvious differences between G. L. c. 147, § 17A, and Waltham General Ordinances, c. 14, § 14-5.1, are applicable to the facts in this case, we decline to pass on the question whether § 17A has been accepted by the city. In addi-

tion, there is nothing in the record as it comes to us, nor in G. L. c. 147, §§ 17A and 17B, which supports the provision in the final decree to the effect (as we understand it) that the city must pay the plaintiffs for holidays worked after August 26, 1969, the difference between one fifth of a week's pay and one seventh of a week's pay "computed at a rate of time and one half." Waltham General Ordinances, c. 14, § 14-5.1 (so far as set forth in the record before us), and G. L. c. 147, § 17A, both require only that the city give an additional day's pay based on the rate of the officer's regular compensation, not on the rate of his overtime compensation; and although § 17A would permit a higher rate to be established "by the person or persons authorized to establish pay scales in the respective police departments," we are directed to no Waltham ordinance which has the effect of establishing a higher rate.

In conclusion, we hold that the city is indebted to each plaintiff for the difference between one fifth and one seventh of a week's pay for each holiday between April 1, 1964, and April 1, 1970, on which he was required to work, or which fell on his regular day off, and for which no additional day off was given, to be computed on the basis of his regular compensation for forty hours, and not on the basis of overtime compensation.

### Laches or Waiver

The city in its answer pleaded that the plaintiffs' suit should be barred by operation of laches, and that the plaintiffs had acquiesced in the compensation policies they now attack. The point raised is sound in law, for "it would not be in accordance with sound principles to permit the plaintiff to accept in silence a stipulated weekly wage week after week and then, without previous notice, seek to recover more." *Woods* v. *Woburn*, 220 Mass. 416, 420 (1915). However, when the defense of

laches is raised, the defendant must not only show inordinate delay by the plaintiffs in bringing their suit but must also prove that the delay was prejudicial. *Mosely* v. *Briggs Realty Co.* 320 Mass. 278, 283 (1946). *Pettinella* v. *Worcester*, 355 Mass. 412, 414-415 (1969). The burden is on the defendant, and the determination is ordinarily a question of fact. *McGrath* v. *C. T. Sherer Co.* 291 Mass. 35, 59-60 (1935).

In the case before us, there are no findings in the master's report to support the city's defense of laches. As that report was made subject to no objection by the city, as no appeal was taken from the interlocutory decree confirming it, and as the evidence is not before us, there is nothing in the record to show that the city's defense was made out in fact, or that the judge was in error. The defense must therefore fail.

Finally, we note that those parts of the final decree which purport to declare the general principles governing the rights of the plaintiffs to recover additional compensation (paragraphs numbered one through seven) are cast in such general and vague terms that it is only by reference to the master's report and the briefs of the parties that we are enabled to understand how those paragraphs reflect the principles on which the specific dollar computations have been based. Those paragraphs are to be revised so as to reflect succinctly the principles set forth in this opinion. The dollar awards (paragraph 8) are to be recomputed in accordance with those principles.

The final decree is reversed, and the case is remanded for further proceedings in conformity with this opinion.

*So ordered.*