Cratsley, J.
The plaintiffs, Aviad Dagan and Vered Dagan (“Dagans”), brought this' action against the defendant, the Jewish Community Housing for the Elderly (“JCHE”), seeking damages for alleged violations of the Minimum Fair Wage Law, G.L.c. 151, and the Weekly Payment of Wages Act. G.L.c. 149, §148. This matter is before this Court on JCHE’s motion for partial summary judgment against the Dagans’ G.L.c. 151 claim and the Dagans’ crossmotion for summary judgment. For the reasons set forth below, the defendant’s motion for partial summary judgment is ALLOWED, and the plaintiffs’ motion is DENIED.
BACKGROUND
The following facts are essentially undisputed. This Court notes the points of disagreement between the parties and, for the purposes of JCHE’s motion for summary judgment, resolves the conflicts in favor of the Dagans.
JCHE is an entity comprised of nine corporations with a collective mission to develop and manage affordable housing and provide support services for the elderly in the greater Boston area. JCHE began in 1965 when the Jewish Community Housing for the Elderly, Inc. (“JCHE I”) was created to build and operate a housing complex for the elderly known as Ulin House. Over time, JCHE constructed new housing complexes, creating a new corporation to build and operate each additional housing complex. In particular, the corporation Jewish Community Housing for the Elderly IV, Inc. (“JCHE IVj was created to build and operate the Golda Meir House.[2] The corporations comprising JCHE share the same president, Ellen Feingold, and the same board of directors. Contracts, correspondence and other documents in the record, which generally refer only to JCHE, create the impression that the various housing complexes, rather than being owned and operated by separate corporations , are controlled by J CHE with unified rules, policies, and goals.[3]
In October 1977, the Internal Revenue Service granted JCHE IV tax exempt status pursuant to Section 501(c)(3) of the Internal Revenue Service Code. JCHE IV’s Amended Articles of Incorporation provides that JCHE IV is organized exclusively for the charitable and/or educational purpose of providing elderly persons with “housing facilities and services specially designed to meet their physical, social and psychological needs . . . the charges for such facilities and services to be predicated upon the provision, maintenance and operation thereof on a non-profit basis.”
JCHE IV rents apartment units in Golda Meir House to individuals and couples over the age of 62 who meet certain eligibility standards set by the federal government. Since the residents of Golda Meir House pay rent equal to 30% of their adjusted gross annual income, elderly tenants pay below the comparable market rent for their apartments. Pursuant to Section 8 of the Federal Housing Act, HUD provides rental subsidies for 80% of all of Golda Meir House’s elderly tenants. Moreover, private charitable contributions subsidize additional health and social programs offered to the tenants.
In October 1991, the Dagans signed “JCHE Site Representative Agreements” in which they agreed to serve as site representatives at the Golda Meir House. Pursuant to the employment agreements and related documents, the Dagans were on call from 5 p.m. until 8 a.m. on weekdays, and throughout the entire weekend and holidays. The Dagans were required to check the premises every two hours from 6 p.m. to 10 p.m. on weekdays for security and maintenance purposes. Assuming that each of the security rounds took one and a half hours to complete,[4] the Dagans spent no more than 21.5 hours each week conducting security rounds.[5] The Dagans were also required to respond to all medical, security and maintenance emergencies. The Dagans’ duty log shows that they received a total of 229 calls from October 1991 to June 1994, ranging from one to 15 calls in a month, with an average of one or two calls per week. Typical emergency calls included registering residents’ complaints, performing minor maintenance such as unstopping toilets, checking in on residents at the request of concerned relatives, and calling ambulances for sick or injured residents.
In exchange, JCHE provided the Dagans with an apartment in Golda Meir House rent free, and their telephone and utility bills. Pursuant to the employment agreements, the Dagans received no other compensation for their services.[6] Specifically, the Dagans did not receive any regular hourly wage, overtime pay, medical insurance, or unemployment insurance. In July 1994, JCHE terminated the Dagans’ employment and evicted them from their apartment.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving parly bears the burden of affirmatively demonstrating the absence of a *38 triable issue “and [further] that the moving party is entitled to judgment as a matter of law.” Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). Where the situation is such that “in essence there is no real dispute as to the salient facts or if only a question of law is involved,” summary judgment shall be granted to the party entitled to judgment as a matter of law. Cassesso, supra.
A. Minimum Wage and Overtime Requirements
The Massachusetts Minimum Fair Wages Act (“Act”), G.L.c. 151, requires an employer to pay a minimum hourly wage of $4.25 to any employee engaged in any occupation. G.L.c. 151, §1.[7] The Act further requires the payment of one and one-half times the regular rate of pay for all hours worked in excess of forty hours per week. G.L.c. 151, §1A.[8] In order to determine whether an employer has violated the Act, it is therefore necessary to determine for each week the number of hours of working time for which compensation is due. In particular, this Court is faced with the issue of whether the Dagans’ on-call time constituted working time subject to the Act.[9]
The federal Fair Labor Standards Act (FLSA), in 29 U.S.C. §§206, 207, imposes the same minimum wage and overtime pay requirements as the state Act. The Supreme Court has held that waiting time may constitute compensable working time under the FLSA under the appropriate circumstances. Skidmore v. Swift & Co., 323 U.S. 134, 137.[10] Making this determination involves the consideration of factors articulated in Skidmore and its progeny, including: “the working agreements between the parties, the presence or absence of a requirement that the employee remain on the employer’s premises . . . , the sufficiency of the waiting time for use by the employee for personal matters, the degree to which the employee is . . . free to engage in personal matters during the waiting time, and whether the time spent waiting is spent predominantly for the employer’s benefit or the employee’s benefit.” 3 ALR Fed. 675, 680, Call or Waiting Time as Working Time Within the Minimum Wage and Overtime Provisions of the Fair Labor Standards Act (29 USC §§206,207), §2(a) (and cases cited therein).
While caselaw is limited, Massachusetts courts appear to apply the same general principles as the federal courts to decide whether waiting time is working time. In Erickson v. Waltham, 2 Mass.App.Ct. 436 (1974), the court held that police officers’ lunch hours, during which they were subject to call, were not subject to G.L.c. 147, §17B, the statute governing overtime pay for police officers. The Erickson court turned to federal cases interpreting the analogous federal law, the Federal Employees Pay Act of 1945, 5 U.S.C. §911, to state the rule that “[generally speaking, time available for, or spent, sleeping and eating is non-compensable, even where the employee is required to be on the employer’s premises.” Id. at 442. See also DeCourcey v. Weston Racquet Club, Inc., 15 Mass.App.Ct. 373, 375 (1983) (“with respect to compensation for time spent sleeping . . . generally such time was not compensable” under G.L.c. 151). Accordingly, this Court finds it appropriate to look to the federal caselaw for substantial guidance to determine, from the undisputed facts on the record, whether the Dagans are entitled to compensation for their waiting time.[11]
In circumstances closely analogous to the instant case, federal courts have held that waiting time was not working time subject to minimum wage and overtime requirements. For example, in Petralik v. Community Realty Co., 347 F.Supp. 638 (D. Md. 1972), the plaintiff was employed by the owner of an apartment complex to perform maintenance services. In accordance with the employment agreement, the plaintiff lived in one of the apartments as part of his compensation. Besides his regular work hours, the plaintiff was occasionally required to be on call for a 24-hour day falling on Saturday or Sunday. The court held that the plaintiff was entitled to compensation only for those hours of the on-call time that he actually worked. The plaintiff was not entitled to compensation for the remaining time, since he was free to use that time as he desired. See also Kelly v. Hines-Rinaldi Funeral Home, 847 F.2d 147 (4th Cir. 1988) (as a matter of law, where “overwhelming amount” of on-call time “was available for [the employee’s] uninterrupted use,” i.e. sleeping, the waiting time is not compensable).
In this case, the undisputed facts show that the Dagans and JCHE entered into a written employment agreement which expressly provided that the Dagans would perform the security rounds and respond to emergency calls for no compensation beyond free housing, telephone, and utilities. As noted earlier, the security rounds accounted for no more than 21.5 hours, and the Dagans received an average of only one or two emergency calls each week. In contrast, each of the Dagans were on call for 123 hours each week, for a total of 246 hours. Thus, accepting as true all facts alleged by the Dagans and granting them every reasonable inference, the inescapable conclusion remains that only a minor portion of the Dagans’ on-call hours (21.5 hours plus the time it took to respond to one or two emergency calls) was spent actually working. It is undisputed that the Dagans could and did utilize the remaining time for personal endeavors such as sleeping, eating, watching television, reading, playing games on their computer, entertaining visitors, and even engaging in other business endeavors. Clearly, the Dagans’ idle on-call time was spent predominantly for their own benefit, not JCHE’s. Applying the previously stated factors to these circumstances, and considering the analogous federal law, this Court holds that as a matter of law the Dagans’ on-call time did not constitute working time subject to minimum and overtime pay requirements.
Accordingly, JCHE’s motion for summary judgment against the Dagans’ claim for back pay for their “waiting time” while on call is ALLOWED.
*39 B. Exceptions to the Minimum Wage Requirement
JCHE contends that to the extent that any or all of the Dagans’ on-call time was subject to the minimum wage requirements of the Act, G.L.c. 151, §7 provides a specific exception for “janitors and caretakers of residential property, who, when furnished with living quarters, shall be paid a wage of not less than thirly-six dollars per week.” This is legally incorrect.
General Laws c. 151, §1 provides the minimum hourly wage that an employer must pay an employee “unless the commissioner has expressly approved . . . payment of a lesser wage under the provisions of sections seven and nine.” Section 9 provides the circumstances in which the commissioner may allow employment at wages below the established minimum wage rate. Section 7 states that when the commissioner exercises this authority, “[tjhe commissioner shall not establish minimum fair wage rates below one dollar and eighty-five cents per hour, . . . except for janitors and caretakers of residential property, who when furnished with living quarters, shall be paid a wage of not less than thirty-six dollars per week.” In short, the language in §7 regarding “janitors and caretakers of residential property” is triggered only when the commissioner exercises his authority to establish a wage below the minimum wage, and seeks to set a wage below $1.85 per hour. As this is not the case, G.L.c. 151, §7 has no bearing in this action.
Accordingly, JCHE’s motion for summary judgment against the Dagans’ minimum wage claims is DENIED.
C. Exceptions to the Overtime Pay Requirement
The section of the Act requiring the payment of overtime wages “shall not be applicable to any employee who is employed:— ... (16) in a hospital, sanatorium, convalescent or nursing home, infirmary, rest home or charitable home for the aged.” G.L.c. 151, §1A. “[A] basic tenet of statutory construction is to give the words their plain meaning in light of the aim of the Legislature.” Commonwealth v. Vickey, 381 Mass. 762, 767 (1980); see also Shubshelowicz v. Fall River Gas Co., 412 Mass. 259, 262 (1992) (“The language of a statute is the best indication of legislative intent").
Here, the Dagans were employees at Golda Meir House, a housing complex devoted entirely to providing housing to the elderly at below-market prices by qualifying for subsidies from the federal government. Golda Meir House is run by JCHE IV, which is recognized by the IRS as a charitable, non-profit corporation. The Dagans contend that subsection (16) is inapplicable here because JCHE, as the named defendant and the purported parent corporation of JCHE IV, is a for-profit corporation engaged in managing various housing complexes, and is not a “charitable home from the aged.” However, from the plain language of the statute, it is clear that the focus of the overtime exemptions is on the employees and the nature of their employment. The question, therefore, is not whether JCHE itself is a charity. Rather, the critical inquiry is whether the Dagans’ place of employment, the Golda Meir House, is a “charitable home for the aged.”[12]
Based on the purpose of the Golda Meir House and the non-profit status of JCHE IV, this Courtis convinced that the Golda Meir House is a “charitable” institution. See M.I.T. Student House, Inc. v. Board of Assessors of Boston, 350 Mass. 539 (“[w]e have no doubt that to provide living quarters for needy persons is a charitable purpose”). More difficult is whether the Golda Meir House is a “home for the aged.” JCHE contends that “home” in subsection (16) merely means “the place in which one resides” so that the exemption extends to “any and all types of elderly housing facilities.” This Court notes, however, that the phrase “charitable home for the aged” is immediately preceded by the words “hospital, sanatorium, convalescent or nursing home, infirmary, [or] rest home.” G.L.c. 151, §1A(16). This language suggests that subsection (16) is intended to apply to facilities devoted to providing care, particularly medical care, to those who have become too sick or elderly to care for themselves. “It is an accepted principle of statutory construction that words and phrases used in a statute should be construed by reference to their associated terms in the statutory context.” Morrison v. Lennett, 415 Mass. 857, 863 (1993). In light of this principle, it appears to this Court that the appropriate definition of “home” in subsection (16) is “an establishment providing residence and care for people with special needs,” i.e. “homes for the elderly.” Webster’s Ninth New Collegiate Dictionary (1984) at 577. This Court holds that the term “home for the aged” is limited to facilities providing special care for the elderly, and does not extend to those which merely provides them a place to live. Since the Golda Meir House primarily provides housing to the elderly,[13] this Court holds that it is not a “home for the aged” within the meaning of §1A(16).
This conclusion is consistent with the recognized legislative intent of G.L.c. 151, §1A. The Supreme Judicial Court has noted that some exceptions, such as those for “workers in hotels, restaurant, gasoline stations and hospitals, are for jobs that may require continuous service by a particular person beyond the confines of an eight hour schedule.” Fitz-Inn Auto Parks, Inc. v. Commissioner of Labor & Industries, 350 Mass. 39, 42 (1965) (apparently referring to subsections (12), (13), (14), and (16)). In contrast to those service-intensive positions, the Dagans were required only to conduct occasional security rounds and respond to sporadic emergency calls, interspersed with large amounts of idle time. While the Dagans were on call for more than eight hours at a time, it is apparent from the record that the Dagans rarely, if ever, exceeded more than eight hours of compensable working time in any single day. Clearly, the Dagans’ Site Representative positions were not “jobs that ... re *40 quire continuous service by a particular person beyond the confines of an eight hour schedule.”
This Court therefore holds that the Dagans are not exempted as workers in a “charitable home for the aged” under G.L.c. 151, §1A. To the extent, if any, that the Dagans’ compensable working time exceeded forty hours per week, they were entitled to time and a half under G.L.c. 151, §1A. Accordingly, JCHE’s motion for summary judgment against the Dagans’ overtime wage claims is DENIED.[14]
D. Offsetting Costs
JCHE contends, and the Dagans do not dispute, that the provision of the rent-free apartment with free utilities and telephone service to the Dagans constitutes a form of compensation for their services which may be used to offset JCHE’s liability under G.L.c. 151, §§1 and 1A. This Court so holds. See Soler v. G. & U., Inc., 833 F.2d 1104, 1109-10 (2d Cir. 1987) (housing furnished for primary benefit of workers constitutes “wages” under FLSA); Celmer v. Schmitt, 645 P.2d 946, 947 (employee compensated in part through rent-free housing).
The HUD contract rent for a one-bedroom apartment at the Golda Meir House is $763 per month,[15] amounting to an annual shared salary of $9156, or about $176 weekly. Thus, in order for JCHE to be liable for back pay for any particular week, the Dagans must have accumulated enough working time to entitle them to more than $176 worth of compensation. At minimum wage rates, this translates to approximately 42 hours of compensable working time between both of the Dagans ($4.25/hr X 42 hours = $178.50). As noted earlier, the security rounds comprised no more than 21.5 hours of working time each week. This leaves only the one or two weekly emergency calls to satisfy the remaining balance of 20.5 hours.[16] From these undisputed facts, this Court rules that as a matter of law the Dagans could not accumulate in any particular week sufficient working time to entitle them to more compensation than they received through their rent-free apartment.
To summarize, the Dagans are entitled to minimum wage for the time spent conducting security rounds and responding to emergency calls, but not for “waiting time” during their on-call hours. To the extent that such working time exceeded forty hours per week, the Dagans are also entitled to time and a half overtime pay. However, as a matter of law, the provision of a rent-free apartment, utilities, and telephone service to the Dagans more than compensates for all of the Dagans’ working time, so as to free JCHE from any further liability under G.L.c. 151, §§1 and 1A.
Accordingly, JCHE’s motion for summary judgment against the Dagans’ claim that they are entitled to back pay under G.L.c. 151, §§1 and 1A is ALLOWED. As JCHE is entitled to judgment as a matter of law, it follows that the Dagans’ motion for summary judgment must be DENIED.
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendant Jewish Community Housing for the Elderly’s motion for partial summary judgment is ALLOWED, and the plaintiffs Aviad and Vered Dagan’s motion for summary judgment is DENIED.
Because this Court is of the opinion that this decision also resolves plaintiffs’ Count II, claiming violations of M.G.L.c. 149, §148, this Court invites defendant to submit a further Motion for Final Judgment. Plaintiffs’ opposition, if any, should focus on whether any issue remains for trial on Count II following this decision on Count I, the M.G.L.c. 151 claim.

The other corporations are: (1) Jewish Community Housing for the Elderly II, Inc. (“JCHE II”), which owns and operates Leventhal House, (2) Jewish Community Housing for the Elderly III, Inc. (“JCHE III”), which built and originally owned Genesis House, (3) Genesis Elderly Housing, Inc., a corporation which serves as the general partner of a limited partnership which subsequently purchased Genesis House, and (4) Jewish Community Housing for the Elderly (“JCHE V”), which owns and operates Campus House. The other related corporations are the Friends of the Jewish Community Housing for the Elderly, Inc. (“Friends of JCHE”), which solicits funds for the above corporations, and the Jewish Community Housing Management Corp. (“JCHE Management”), which provides administrative and management services, i.e. payroll services.

There is considerable controversy between the parties as to the identity of the actual defendant in this case. The Dagans contend that their suit is against “JCHE,” purportedly the parent corporation which ultimately controls the Golda Meir House and other JCHE housing complexes. The defendant maintains that “JCHE” is merely a generic designation for the nine corporations which share the JCHE name and mission, that these nine corporations operate independently from one another, and that JCHE itself does not actually exist. Under this argument, the actual defendant is “JCHE IV,” the corporation which built and currently operates the Golda Meir House. Despite this argument, defendant failed to move to dismiss for misnomer of party. See Mass.R.Civ.P. 12(b)(8). For the purposes of the defendant’s motion for summary judgment, this Court assumes that the entity “JCHE” exists, controls JCHE IV and other corporations, and is the actual defendant in this case.

Aviad Dagan states in his deposition that each security round took up to one and a half hours. Vered Dagan, however, testified that each round took from 15 to 20 minutes. For the purposes of JCHE’s motion for summary judgment, this Court assumes that each security round took one and a half hours.

 3 rounds/weekday X 1.5 hour/round X 5 weekdays = 21.5 hours.

The employment agreements state, “As a Site Representative at JCHE I fully understand that my apartment is the work site for the performance of my job and is in exchange for duties performed.” The agreements also state, “I understand as a Site Rep. that no other compensation is given for my services other than what is herein listed. (Apartment, basic telephone service and utilities).”

General Laws c. 151, §1, amended by St.1990, c. 306, §1 provides in pertinent part, “It is hereby declared to be against public policy for any employer to employ any person in an occupation in this commonwealth at an oppressive and un *41 reasonable wage . . . and any contract, agreement or understanding for or in relation to such employment shall be null and void. A wage of less than four dollars and twenty-five cents per hour, in any occupation, as defined in this chapter, shall conclusively be presumed to be oppressive and unreasonable, wherever the term ‘minimum wage’ is used in this chapter.”

General Laws c. 151, §1A provides, in pertinent part: “Except as otherwise provided in this section, no employer in the Commonwealth shall employ any of his employees ... for a work week longer than forty hours, unless such employee receives compensation for his employment in excess of forty hours at a rate not less than one and one half times the regular rate at which he is employed.”

The Dagans were required to be on call between the hours of 5 p.m. and 8 a.m. on weekdays, and throughout the weekends. Thus, in a typical week, each of the Dagans were on call for 123 hours. Under the Dagans’ argument, therefore, JCHE would owe each of them (40 hours X $4.25/hr) + (83 hours X $4.25/hr X 1.5) = $170 + $529.13 = $699.13 per week.

The Supreme Court stated: “We have not attempted to, and we cannot, lay down a legal formula to resolve cases so varied in their facts as are the many situations in which employment involves waiting time. Whether in a concrete case such time falls within or without the Act is a question of fact to be resolved by appropriate findings of the trial court. . . This involves scrutiny and construction of the agreements between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances. Facts may show that the employee was engaged to wait, or they may show that he waited to be engaged. His compensation may cover both waiting and task, or only performance of the task itself. Living quarters may in some situations be furnished as a facility of the task and in another as a part of its compensation. The law does not impose an arrangement on the parties. It imposes upon the courts the task of finding what the arrangement was.” Id.

After the seminal Skidmore case, the Department of Labor developed regulations outlining circumstances when waiting time did or did not constitute compensable working time. In so doing, the Department of Labor articulated specific exceptions where an employee’s waiting time is not compen-sable under the FLSA. In turn, the federal courts have recognized these exceptions and, in deference to the Department of Labor, given them substantial weight. JCHE urges this Court to adopt one of these exceptions, the “homeworkers exception.” See Halferty v. Pulse Drug Co., Inc., 864 F.2d 1185 (5th Cir. 1989). It is not necessary for this Court to specifically recognize such an exception in the state Act, since the general principles recognized in federal cases interpreting the FLSA provides sufficient guidance for this Court to decide the instant case.

The Dagans also maintain that by violating Massachusetts wage laws, JCHE is “estopped” from relying on the exemptions contained in G.L.c. 151 by “public policy reasons” and “well-settled principles of statutory construction.” The logical flaws in this argument are obvious. First, if the Dagans are exempted by statute from the requirement of minimum or overtime wages, then JCHE’s nonpayment of such wages does not violate the Act. Second, to the extent that JCHE did violate the Act, the Dagans are entitled only to what the Act provides, and no more. Therefore, if language in an exemption limits liability, such language cannot be ignored. “A statute cannot be extended by construction or enlargement beyond its fair import.” Prondecka v. Turners Falls Power & Elec. Co., 238 Mass. 239, 243 (1921).

The record shows that the Golda Meir House offered some health and social programs geared for its elderly residents. However, there is no indication that any of these programs rose to the level of care comparable to that provided in a “hospital, sanatorium, convalescent or nursing home, infirmary, [or] rest home.” To the contrary, JCHE took pains to distinguish itself from such facilities. JCHE describes itself in its “Mission Statement” as promoting the “independence” of its residents, supporting their ability to avoid moving to “a more sheltered, more clinical environment,” and emphasizing “the non-institutional quality of life” within its complexes.

Arguably, the Dagans are not entitled to overtime pay under G.L.c. 151, §1A(1), which exempts “janitor[s] and caretaker[s] of residential properly, who when furnished with living quarters is paid a wage of not less than thirty dollars per week.” Since JCHE makes no such claim in its motion for summary judgment, this Court does not address this issue.

Notwithstanding the rent established by HUD of $763 per month, JCHE contends that the actual market value of the Dagans’ one-bedroom apartment is $950 per month and seeks to offset this figure against any compensation owed to the Dagans. The Dagans make no claim as to the value of the rent-free apartment. For the purposes of JCHE’s motion for summary judgment, this Court will rely on the lower rate established by HUD.

This reasonably assumes that the Dagans divided the work between them so that neither accrued more than 40 hours per week. However, even assuming that either Aviad or Vered performed all of the work in a particular week in order to maximize the number of overtime hours, he or she would still have had to accumulate 41 hours of working time ((40 hrs X $4.25/hr) + (1 hrX$4.25/hrX 1.5) = $176.38). Minus the 21.5 hours maximum spent on security rounds, this means that the one or two weekly emergency calls would have had to comprise at least 19.5 hours of working time.